**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Board of Education of Boardman Local Schools and the Board of Education of Liberty Local Schools, individually, and on behalf of all others similarly situated, | ) ) ) ) | Civil Action No. |
| | ) | |
| Plaintiffs, | ) | Judge: |
| | ) | |
| v. | ) | Class Action Complaint |
| | ) | |
| McKinsey & Company, Inc., McKinsey Holdings, Inc., McKinsey & Company, Inc. United States, and McKinsey & Company, Inc. Washington D.C., | ) ) ) ) | Jury Trial Demanded |
| | ) | |
| Defendants. | ) ) | |

## <u>CLASS ACTION COMPLAINT</u>

1

## I.  INTRODUCTION

1.      For more than two decades, the opioid crisis has raged across this country. An opioid-related public health emergency was declared by the President in 2017. Last year was the worst on record, with drug overdoses soaring nearly 30%.[1] Today, there are increasingly few Americans whose lives have not been affected by the consequences of opioid dependency, addiction, and overdoses.

2.      McKinsey is a management consulting firm with operations across the globe. It played a central role in the unfolding, propagation, and exploitation of the opioid crisis by advising multiple opioid manufacturers and other industry participants on how to sell as many opioids as conceivably possible. Knowing that its clients' products were highly addictive, ineffective, and unsafe for the treatment of long-term chronic pain, non-acute pain, and non-cancer pain, McKinsey developed a singular focus on increasing opioid sales, no matter the resultant cost to society. McKinsey did this for well over a decade, despite knowing full well the risk to public health and safety and the widespread economic harm from developing and implementing the transformation of strictly-controlled substances into top-selling blockbuster drugs.

3.      The purpose of McKinsey's work with its opioids clients was at all times to maximize return on investment. The whole point for those clients (and hence McKinsey) was to make as much money as possible. They all did. This relentless drive to increase sales and create greater availability of opioids was made with no concern about the parallel, known, and inevitable increase in opioid-related deaths, addiction, abuse, diversion, and misuse.

---

[1] Betsy McKay, "U.S. Drug-Overdose Deaths Soared Nearly 30% in 2020, Driven by Synthetic Opioids," *Wall Street Journal*, July 14, 2021, *available at*: https://www.wsj.com/articles/u-s-drug-overdose-deaths-soared-nearly-30-in-2020-11626271200.

4.      In the world of management consulting, McKinsey is preeminent. It is one of the world's oldest, largest, and most lucrative consulting firms and is generally seen as the most prestigious firm in the industry. More consiglieri than a one-off advisor, McKinsey touts its model of engaging in "transformational partnerships" with its clients. McKinsey learns each client's business intimately, embeds itself into all levels of the corporate hierarchy, and provides granular strategies to achieve transformative goals for its clients.

5.      Marvin Bower, the managing director of McKinsey from 1950 to 1967, was "the father of the consulting profession."[2] He "turned the business of selling management advice into a keystone of American corporate culture," and is "credited with taking a fledgling industry and setting its course not only as to the kinds of services it could sell but also the standards it must uphold for its work to be respected."[3] A lawyer by trade, Bower stressed that management consulting should be seen as an emergent profession, akin to the law or accounting, with obligations to clients and to the broader society that extend beyond the mere commercial.

6.      Bower instilled an ethos at McKinsey that has been reinforced throughout the decades as a core value of the firm: "Deliver the bad news if you must, but deliver it properly."[4] Bower's principles, and the values he imparted within McKinsey, are said to guide the firm to the present day. "In many ways, certainly in spirit and soul, Marvin continued to lead it after he retired, and he leads it still," eulogized Rajat Gupta, McKinsey's then-global managing partner, at Bower's funeral in 2003.[5]

---

[2] Douglas Martin, *Marvin Bower, 99; Built McKinsey & Co.*, N.Y. Times, Jan. 24, 2003, *available at*: https://www.nytimes.com/2003/01/24/business/marvin-bower-99-built-mckinsey-co.html.

[3] *Id.*

[4] Duff McDonald, *The Firm* 35 (2014).

[5] *Id.* at 270. In many ways, Gupta was an interesting figure to opine on Bower's legacy. Indeed, Gupta's leadership of McKinsey is in many respects to be *contrasted* with Bower's legacy. Many of the values Bower emphasized—an emphasis on professionalism over commercial exploitation, for example—were jettisoned under Gupta's tenure as managing partner of the firm, which ended in 2003. "Under his watch, McKinsey began to chase top billings in a way it never had before." *Id.* at 234. For instance, McKinsey first began accepting equity stakes in clients as a form

7.     This case is, in large part, about the firm's failure to adhere to Bower's simple, foundational tenet. It arises instead from the firm's steadfast and continual work to maximize opioid sales in partnership with numerous clients during the pendency of the worst man-made epidemic in modern medical history. It is about McKinsey never delivering the "bad news" of opioids' devastating impact on Plaintiffs and the public, properly or otherwise, and instead looking the other way for money.

8.     When it came to opioids, McKinsey did far more than just give advice. Not only did it suggest courses of action that its clients should adopt, the firm remained in place and worked collaboratively alongside its clients to actually implement McKinsey's recommendations to achieve objectives jointly identified by the clients and McKinsey. McKinsey stood alongside its clients in the arena doing the deeds.

9.     The deceptive marketing strategies that McKinsey and its clients invented, developed, deployed, and continually refined for years to expand the market for opioids are foundational to the epidemic.

---

of incentive compensation during Gupta's tenure. Previously, McKinsey only charged standard fees for its consulting services as Bower disdained the notion of taking equity stakes in clients. *Id.* at 234. Under Gupta, McKinsey also began to allow consultants' compensation to be tied to client performance. *Id.*

Consistent with Gupta's efforts to monetize McKinsey's consulting business in ways previous firm leadership had not, McKinsey also began to expand its client base. "While the firm would never admit as much, under Gupta, McKinsey began working for just about anyone with a fat bank account and a checkbook." *Id.* at 266.

Institutions age, and by the time Gupta came to lead the firm in 1994, McKinsey was a mature institution. It had built up significant value in its *reputation* by historically advising *only* "blue chip" companies "at the top of the corporate pyramid." *Id.* Under Gupta, McKinsey began the process of realizing that value. For McKinsey, the way to monetize an elite reputation was to start advising those it historically may have shunned as clients—to start offering its *imprimatur*, in addition to its services, for money. McKinsey's work with opioid manufacturers began under Gupta's leadership.

4

10. McKinsey worked hand-in-hand with major opioid manufacturers, including Purdue Pharma L.P., Endo Pharmaceuticals,[6] Johnson & Johnson,[7] and Mallinckrodt[8] for years. At the same time, McKinsey advised other participants in the opioid supply chain, including distributors, pharmacies, and even regulators.

11. In particular, McKinsey advised the Sackler family and their company, Purdue, for years while Purdue aggressively marketed OxyContin, widely viewed as the taproot of the opioid crisis. The relationship began no later than 2004. In the years following Purdue's 2007 guilty plea for misleadingly marketing OxyContin, McKinsey continued to work closely with Purdue to dramatically increase OxyContin sales, notwithstanding the existence of a five-year Corporate Integrity Agreement that Purdue entered as part of its guilty plea.

12. McKinsey knew of the dangers of opioids, and, in particular, the prior misconduct of Purdue but nonetheless advised Purdue and other opioid manufacturers to improperly market and sell OxyContin and other prescription opioids, supplying granular sales and marketing strategies and remaining intimately involved throughout the implementation of those strategies. McKinsey's actions resulted in a surge in sales of OxyContin and other opioids that fueled and prolonged the opioid crisis.

13. For years, McKinsey advised Purdue on, designed, and helped to implement various strategies to raise sales of OxyContin by focusing on high dose sales and deceptively messaging to physicians that OxyContin would improve function and quality of life.

---

[6] "Endo Pharmaceuticals" or "Endo" refers to Endo Health Solutions Inc., Endo International plc, and Endo Pharmaceuticals Inc., collectively.

[7] "Johnson & Johnson" refers to Johnson & Johnson Services, Inc. and its wholly-owned subsidiary Janssen Pharmaceuticals, Inc. ("Janssen").

[8] "Mallinckrodt" refers to Mallinckrodt LLC and Mallinckrodt plc, together.

14.     McKinsey's partnership with Purdue reached its fever pitch in the summer of 2013. In January of that year, Purdue's Corporate Integrity Agreement expired, and Purdue was no longer bound by its constraints. Within months, the Sacklers tasked McKinsey with transforming Purdue's approach to OxyContin sales in order to extract as much money as possible from the remaining patent life of the drug.[9]

15.     In response, McKinsey developed and proposed Project Turbocharge, a series of transformational changes that McKinsey proposed to implement at Purdue to dramatically increase OxyContin sales by re-tooling Purdue's sales force and investing large amounts of capital to "turbocharge" it. "[O]ur recommendation is that Purdue makes a clear go-no-go decision to 'Turbocharge the Sales Engine'," McKinsey told Purdue on August 8, 2013.

16.     The Sacklers chose "go," and McKinsey subsequently implemented and continually refined Project Turbocharge at Purdue over the course of years, to devastating, but profitable, effect.

17.     McKinsey has recently been the subject of scrutiny for its various business practices, including its work facilitating the opioid crisis with Purdue.[10] On March 7, 2019, Kevin Sneader, McKinsey's then-global managing partner, addressed all McKinsey employees regarding this scrutiny. Drawing inspiration from Theodore Roosevelt, Sneader stated,

> [W]e cannot return to a time when we were in the background and unobserved. Those days have gone. Indeed, I have little doubt that scrutiny—fair and unfair—

---

[9] OxyContin, like any branded pharmaceutical, is subject to eventual patent expiration and competition from generic opioid manufacturers.

[10] *See* Michael Forsythe and Walt Bogdanich, *McKinsey Advised Purdue Pharma How to 'Turbocharge' Opioid Sales, Lawsuit Says*, N.Y. Times, Feb. 1, 2019, *available at:* https://www.nytimes.com/2019/02/01/business/purdue-pharma-mckinsey-oxycontin-opiods.html.

will continue. It is the price we pay for being "in the arena" and working on what matters.[11]

18.     Weeks later, McKinsey announced that it would no longer work for any opioid manufacturer. "Opioid abuse and addiction are having a tragic and devastating impact on our communities. We are no longer advising clients on any opioid-specific business and are continuing to support key stakeholders working to combat the crisis."[12]

19.     The price for being in the arena is more than mere scrutiny. McKinsey is liable for its misconduct and the harms it caused or exacerbated. McKinsey is liable for its successful efforts to increase opioid sales for years. It continued this work unabated and with alacrity despite events as stunning as Purdue's 2007 guilty plea for misbranding OxyContin, Purdue's 2015 settlement with the State of Kentucky, and numerous other enforcement actions related to opioid sales and marketing by McKinsey clients. Through it all, McKinsey remained steadfast in its efforts to promote opioid sales for all of its clients for the purpose of maximizing return on

---

[11] *See "The Price We Pay for Being 'In the Arena'": McKinsey's Chief Writes to Staff About Media Scrutiny and Scandal*, Fortune Magazine, March 8, 2019, *available at* https://fortune.com/2019/03/08/mckinsey-staff-letter-kevin-sneader/. The "arena" reference is to *Citizenship in a Republic*, a speech delivered by Theodore Roosevelt at the *Sorbonne* on April 23, 1910:

> It is not the critic who counts; not the man who points out how the strong man stumbles, or where the doers of deeds could have done them better. The credit belongs to the man who is actually in the arena [here, McKinsey; and the arena, opioid sales], whose face is marred by dust and sweat and blood; who strives valiantly; who errs, who comes short again and again, because there is no effort without error and shortcoming; but who does actually strive to do the deeds; who knows great enthusiasms, the great devotions; who spends himself in a worthy cause; who at the best knows in the end the triumph of high achievement, and who at the worst, if he fails, at least fails while daring greatly, so that his place shall never be with those cold and timid souls who neither know victory nor defeat.

As it happens, Mr. Sneader is not the only McKinsey person to draw inspiration from Roosevelt. *Citizenship in a Republic* similarly inspired Dominic Barton, the man Mr. Sneader succeeded as McKinsey's global managing partner. It served as the basis for his 2017 address to the Ivey Business School in Canada. *See* Dominic Barton *In the Arena: Leadership in an Age of Disruption,* October 17, 2017, *available at*: https://www.ivey.uwo.ca/media/ 3780710/daquino_lecture2017.pdf. While McKinsey continues to preach the values of corporate integrity from the Bower area, its actions show that it has moved far afield from its professed moral compass.

[12] *See* Paul La Monica, *Consulting firm McKinsey no longer working with opioid maker Purdue Pharma*, CNN, May 24, 2019, *available at*: https://www.cnn.com/2019/05/24/business/mckinsey-purdue-pharma-oxycontin/index.html. The statement was attributed to McKinsey as an entity. No individual's name was attributed.

investment without regard to the obvious implications of what they were doing. Indeed, the firm endeavored alongside its clients to increase the size of the *overall* opioid market for *nearly two decades*, until as late as March 22, 2019, despite increasingly blood-red flags along the way.[13]

## II. THE OPIOID CRISIS IN PUBLIC SCHOOLS AND MCKINSEY'S RESPONSIBILITY FOR IT

20. American public schools perform an indispensable function, central to the health of American democracy, by providing free education to every student who comes through their doors. But, for the last decade at least, public schools' ability to succeed has been taxed by the devastation of the opioid epidemic.

21. The connection between McKinsey's role as the architect of a scheme to "turbocharge" opioid sales and substantial harms to public schools is direct and proximate. As a result of McKinsey's actions, the market was flooded with opioids. That increased the number of women using opioids during pregnancy—and the number of women giving birth to infants born with Neonatal Opioid Withdrawal Syndrome ("NOWS"). NOWS is a group of adverse neurodevelopmental conditions that occur when infants are born with opioid withdrawal symptoms.[14] Four or five years after birth, those children enter the schools. Because of the adverse neurodevelopmental consequences of NOWS, they disproportionately need and receive mandated costly "special education" services, 34 C.F.R. §§ 300.320-300.328, often from pre-kindergarten all the way through high school. The average per pupil expenditure on special education services is almost twice the per pupil cost for other students.[15] By "turbocharging"

---

[13] *See* "About McKinsey's past work for opioid manufacturers," *last updated March 22, 2021*, *available at:* https://www.mckinseyopioidfacts.com ("We decided nearly two years ago to end all work on opioid-specific business . . . .").

[14] Neonatal Opioid Withdrawal Syndrome ("NOWS") is also referred to as Neonatal Abstinence Syndrome ("NAS"). For present purposes, the two labels—NOWS and NAS—refer to the same diagnosed medical condition.

[15] Jay G. Chambers et al., *Total Expenditures for Students with Disabilities, 1999-2000: Spending Variation by Disability*, Special Education Expenditure Project 4 (June 2003), https://www.air.org/sites/default/files/SEEP5-Total-Expenditures.pdf.

opioid sales, McKinsey increased NOWS births, saddling many public schools with large, increased, unfunded costs.

22.     The effect of McKinsey's efforts to increase opioid sales has been staggering. Between 1999 and 2014, the number of women using opioids during pregnancy increased by 333%.[16] A newborn is now diagnosed with NOWS every 15-25 minutes in the United States.[17] The incidence of NOWS increased more than fivefold among infants covered by Medicaid.[18] The financial and other consequences for public schools as a result of the increased incidence of NOWS have been very serious—and were foreseeable.

23.     For years, research has reported that fetal exposure to opioids can produce adverse changes in brain structure and function.[19] And the link between those problems and educational outcomes is not surprising: there is a direct relationship between infants born with NOWS and the need for special education and related services once these children are in school.[20]

24.     In addition, the need for special education services because of the opioid epidemic is not limited to children born with NOWS. Many children living in households battling addiction require special education interventions as well. The children of opioid abusing parents

---

[16] Sarah C. Haight et al., *Opioid Use Disorder Documented at Delivery Hospitalization - United States, 1999-2014*, 67 Morbidity and Mortality Weekly Report 845, 846 (2018).

[17] Saminathan Anbalagan & Magda D. Mendez, *Neonatal Abstinence Syndrome* (2021), https://www.ncbi.nlm.nih.gov/books/NBK551498/.

[18] Tyler N. A. Winkelman et al., *Incidence and Costs of Neonatal Abstinence Syndrome Among Infants With Medicaid: 2004-2014*, 141 Pediatrics e20173520 (2018).

[19] See generally, Emily J. Ross et al., *Developmental Consequences of Fetal Exposure to Drugs: What We Know and What We Still Must Learn*, 40 Neuropsychopharmacology 61, 76 (2015) (discussing research results dating back to 1994).

[20] Mary-Margaret A Fill et al., *Educational Disabilities Among Children Born With Neonatal Abstinence Syndrome*, 142 Pediatrics e20180562 (2018); *see also* Ju Lee Oei et al., *Neonatal Abstinence Syndrome and High School Performance*, 139 Pediatrics 2 (2017).

are at risk for a wide variety of adverse outcomes, even if they were not exposed to opioids in utero.[21]

25.     The opioid epidemic has required many public school districts, including the Plaintiffs named in this Complaint, to expend or divert already scarce resources to support children born with NOWS or whose families are struggling with opioid addiction and death. These students disproportionately require mandated special education and related services or present behavioral and emotional challenges that disrupt classrooms, which in turn place burdens on schools.

## III.     JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction under 28 U.S.C. 1332(d)(2) because: (a) this action is brought as a proposed class action under Fed. R. Civ. P. 23, (b) at least one member of the class is a citizen of a state different from the Defendants, (c) the amount in controversy exceeds $5 million, exclusive of interest and costs, (d) the proposed class contains more than 100 members, and (e) no relevant exceptions apply.

27.     This Court has personal jurisdiction over the Defendants because Plaintiffs' claims arise out of, or relate to, Defendants' contacts with Ohio. At all times relevant hereto, McKinsey engaged in the business of researching, designing, and implementing marketing and promoting strategies for opioid manufacturer Purdue in Ohio and within the counties of the class. McKinsey deliberately engaged in significant acts and omissions within the Class's counties that have injured their residents. McKinsey purposely directed its activities in the Class's counties, and the claims arise out of those activities

---

[21] Gemma Sanjuan Herranz et al., *Children Born to Heroin-Addicted Mothers: What's the Outcome 25 Years Later*, 5 J. Addiction Res. & Therapy 180 (2014).

28.     Venue is appropriate under 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claims occurred in, were directed to, and/or emanated from this District.

## IV.     PARTIES

### A.     Plaintiffs

29.     The Board of Education of Boardman Local Schools, 7777 Glenwood Ave Youngstown, OH 44512, on behalf of itself and all independent public school districts in Ohio.

30.     The Board of Education of Liberty Local Schools, located at 4115 Shady Road, Youngstown, OH 44505, on behalf of itself and all independent public school districts in Ohio.

### B.     Defendants

31.     Defendant McKinsey & Company, Inc. is a corporation organized under the laws of the state of New York. McKinsey's principal place of business is located at 711 Third Avenue, New York, NY 10017. It may be served with process via its registered agent, Corporation Service Company, at 80 State Street, Albany, NY 12207.

32.     Defendant McKinsey Holdings, Inc. is a Delaware corporation with its principal place of business is located at 711 Third Avenue, New York, NY 10017. It may be served with process via its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808

33.     Defendant McKinsey & Company, Inc. United States is a Delaware corporation with its principal place of business is located at 711 Third Avenue, New York, NY 10017. It may be served with process via its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808

34.     Defendant McKinsey & Company, Inc. Washington D.C. is a Delaware corporation with its principal place of business is located at 711 Third Avenue, New York, NY

11

10017. It may be served with process via its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

35.     Upon information and belief, McKinsey & Company, Inc. is the parent company of McKinsey & Company Holdings, Inc., which is itself the parent company of both McKinsey & Company, Inc. United States and McKinsey & Company, Inc. Washington D.C. Upon information and belief, each subsidiary corporation is wholly-owned by its parent. Despite the corporate form, McKinsey began as a partnership and still refers to its senior employees as "partners." Those partners are the firm's shareholders. Collectively, these four Defendants are referenced throughout as "McKinsey."

36.     McKinsey is a global management consultancy with offices in over 130 cities in 65 countries, including the following United States cities: Atlanta, GA; Austin, TX; Houston, TX; Dallas, TX; San Francisco, CA; Los Angeles, CA; Redwood City, CA; Boston, MA; Charlotte, NC; Chicago, IL; Cleveland, OH; Denver, CO; Detroit, MI; Miami, FL; Miramar, FL; Tampa, FL; Minneapolis, MN; Summit, NJ; New York, NY; Philadelphia, PA; Pittsburgh, PA; Seattle, WA; St. Louis, MO; Stamford, CT; Waltham, MA; and Washington, D.C.

37.     McKinsey is registered to do business in all fifty states.

## V.     FACTUAL ALLEGATIONS

38.     Plaintiffs incorporate by reference paragraphs 38-528 of School Districts' Master Complaint, ECF Doc. 297, in, *In re: McKinsey & Co. Inc., Nat'l Prescription Opiate Consultant Litig*, Case No. 3:21-md-02996-CRB (N.D. Cal.).[22]

---

[22] The allegations from School Districts' MDL master complaint are incorporated here by reference, rather than expressly repeated, to avert issues about the possible confidentiality of some of the materials on which some of those allegations are based.

## VI.      TOLLING OF STATUTES OF LIMITATIONS

39.      McKinsey is equitably estopped from relying upon a statute of limitations defense. Alongside its clients, McKinsey undertook active efforts to deceive Plaintiffs and to purposefully conceal its unlawful conduct and fraudulently assure the public, including Plaintiffs, that opioids were non-addictive, effective, and safe for the treatment of long-term chronic pain and non-acute, non-cancer pain with the goal of increased sales, greater availability and access to opioids, and maximizing profits.

40.      McKinsey and its clients were deliberate in taking steps to conceal their conspiratorial behavior and active role in the deceptive marketing of opioids. This deceptive marketing—which included the above falsehoods that opioids were safer, less subject to abuse, and less addictive than other pain medications—was a substantial factor in the oversupply of opioids through overprescribing and suspicious sales, all of which fueled the opioid epidemic.

41.      McKinsey deliberately advised its clients on marketing strategies and tactics to bolster their opioid products as non-addictive, safe, and efficacious without reliable scientific evidence to support the same. McKinsey's consulting services were given confidentially, and both McKinsey and its clients concealed the content of those services from the public. In doing so, McKinsey concealed its role in shaping, editing, and providing the content of the false and misleading materials addressing pain management and opioids that were widely disseminated to regulators, prescribers, and the public at large, including Plaintiffs.

42.      McKinsey also concealed from Plaintiffs the existence of Plaintiffs' claims by hiding it and its client's lack of cooperation with law enforcement. For example, in May 2007, Purdue and three of its executives pled guilty to federal charges of misbranding OxyContin in what the company acknowledged was an attempt to mislead doctors about the risk of addiction and entered into a Corporate Integrity Agreement explained above. Purdue was ordered to pay $600 million in fines and fees. In its plea, Purdue admitted that its promotion of OxyContin was

13

misleading and inaccurate, misrepresented the risk of addiction, and was unsupported by science. Additionally, Michael Friedman, the company's president, pled guilty to a misbranding charge and agreed to pay $19 million in fines; Howard R. Udell, Purdue's top lawyer, also pled guilty and agreed to pay $8 million in fines; and Paul D. Goldenheim, its former medical director, pled guilty as well and agreed to pay $7.5 million in fines.

43. Nevertheless, even after the guilty pleas, Purdue continued to pay doctors on speakers' bureaus to promote the liberal prescribing of OxyContin for chronic pain and fund seemingly neutral organizations to disseminate the message that opioids were non-addictive, as well as other misrepresentations. Purdue also assembled an army of lobbyists to fight any legislative actions that might encroach on its business. Between 2006 and 2015, Purdue and other painkiller producers, along with their associated nonprofits, spent nearly $900 million dollars on lobbying and political contributions—eight times what the gun lobby spent during that period. McKinsey participated extensively in these actions and provided Purdue with strategies and assistance to maximize sales as described in this Complaint. McKinsey knew that the actions it took with Purdue were unlawful and yet deliberately proceeded in order to increase Purdue's sales and profits, and in turn to serve McKinsey's financial interests.

44. McKinsey affirmatively sought to convince the public that its clients' legal duties to report suspicious sales of opioids had been satisfied through public assurances that they were working to curb the opioid epidemic. For example, after the 2007 Purdue guilty plea described above, McKinsey provided services to protect the company's public image and sales, aiding in the concealment of the addictive nature and dangers associated with opioid use and denying blame for the epidemic, attributing it instead solely to abuse and inappropriate prescribing. At the guidance and advice of McKinsey, Purdue and other McKinsey clients publicly portrayed themselves as committed to working diligently with law enforcement and others to prevent diversion of these dangerous drugs and curb the opioid epidemic, and they made broad promises

to change their ways, insisting they were good corporate citizens. Instead, McKinsey assisted
Purdue, for example, with marketing campaigns and messaging that continued business as usual,
indiscriminately targeting high prescribers and promoting opioids as safe but avoiding the pitfalls
of the Corporate Integrity Agreement. These repeated misrepresentations misled regulators,
prescribers, and the public, including Plaintiffs, and deprived Plaintiffs of actual or implied
knowledge of facts sufficient to put Plaintiffs on notice of potential claims.

45.     Plaintiffs did not discover the nature, scope, and magnitude of McKinsey's
misconduct, and its full impact on Plaintiffs—and could not have acquired such knowledge—
any earlier through the exercise of reasonable diligence.

46.     Prior to the applicable limitations period, Plaintiffs did not suspect, and had no
reason to suspect, that McKinsey's conduct caused their injuries, including the consumption of
Plaintiffs' resources.  Even today those injuries are multiplying, as the opioid epidemic remains
unabated.

47.     McKinsey intended that its actions and omissions, alongside its clients, would be
relied upon, including by Plaintiffs. Plaintiffs did not know and did not have the means to know
the truth due to McKinsey and its clients' actions and omissions.

48.     Plaintiffs reasonably relied on the affirmative statements developed by McKinsey
and made by its clients regarding their purported compliance with their obligations under the law
and consent orders. Those statements were false and were intended to only to protect the clients'
public image.

49.     McKinsey's fraudulent concealment has tolled the running of any statute of
limitations. Through its and its clients' affirmative misrepresentations and omissions, McKinsey
actively concealed from Plaintiffs the risks associated with opioids that led to the opioid crisis.

15

The wrongdoing, misrepresentations, and omissions by McKinsey have not ceased because the public nuisance remains unabated.

## VII.  HARM TO PLAINTIFFS AND THE CLASS

50.     McKinsey's intentional and/or unlawful conduct, as described herein, resulted in direct and foreseeable, past and continuing, economic damages, which Plaintiffs and the Class have incurred and continue to incur, including: (1) costs associated with special education, including, but not limited to, special programs for children with opioid-related learning disabilities, or for children in need of psychological counseling or other supports due to opioid-related family crises; (2) costs associated with providing care and support for children whose family members suffer from opioid-related disability or incapacitation and/or opioid use disorder; (3) costs associated with increased school security in all facilities of the school board district; (4) costs for providing medical care, additional therapeutic and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (5) costs associated with increased healthcare and healthcare insurance; (6) costs regarding disability payments; (7) loss of tax revenue; and (8) treble damages. Plaintiffs seek recovery of these costs for all claims and counts, as alleged herein. Plaintiffs also seeks the means to abate the epidemic (created by McKinsey's wrongful and/or unlawful conduct), including but not limited to, economic damages and reimbursement for the costs associated with past, present, and future efforts to address, pay for, and/or eliminate opioid-related hazards to public health and safety.

51.     Plaintiffs, and similarly situated school districts in Ohio, have had to increase resources or divert resources away from other essential functions because of McKinsey's schemes to increase opioid sales. The costs to schools have included increased disability evaluations, increased numbers of students qualifying for educational disability, increased classroom therapies and services, increased administrative expenses, and resources increasingly

diverted from classroom instruction to address behavioral disruptions caused by students whose ability to self-regulate has been compromised by prenatal opioid exposure or their families' addiction to opioids.

52.     A significantly higher proportion of children with a history of NOWS are diagnosed with educational disabilities, including developmental delay or speech or language impairment. They are more likely to have severe intellectual disabilities, autism spectrum disorders, or Attention Deficit Disorder. They are also more likely to fail to meet grade-level norms. These differences, individually and in combination, make children with a history of NOWS significantly and disproportionately more likely to qualify for and receive mandated special education services.[23]

53.     In every one of the counties where Plaintiffs are located, McKinsey conspired with and aided and abetted Purdue and other opioid manufacturers to flood those counties with prescription opioids, causing an increase in babies born with NOWS in those counties and an increase in enrollment by students with NOWS histories in Plaintiffs' school districts.

## VIII.  CLASS ACTION ALLEGATIONS

54.     Plaintiffs bring this case on behalf of themselves and as a statewide class action under Fed. R. Civ. P. 23(a), 23(b)(2) and 23(b)(3) and, alternatively, 23(c)(4), on behalf of all independent public school districts in Ohio ("the Class"). Class members bear the steadily rising costs of providing special education and related supports and services and diversion of resources to provide services to (1) children exposed to opioids *in utero,* which makes those children about twice as likely to exhibit learning and developmental disabilities than children who were not

---

[23] Mary-Margaret A. Fill et al., *Educational Disabilities Among Children Born With Neonatal Abstinence Syndrome*, 142 Pediatrics e20180562 (2018); *see also* Oei JL, Melhuish E, Uebel H, et al. *Neonatal Abstinence Syndrome and High School Performance*, 139 Pediatrics 2 (2017); Sirnes, Eivind, et al. "Brain morphology in school-aged children with prenatal opioid exposure: a structural MRI study." *Early human development* 106 (2017): 33-39. In addition, eighty percent of children with ADHD receive school-based services, at some point, via federally mandated Individual Education Plans (IEPs) or services pursuant to Section 504 of the Rehabilitation Act. Danielson, Melissa L., et al. "A national description of treatment among United States children and adolescents with attention-deficit/hyperactivity disorder." *The Journal of pediatrics* 192 (2018): 240-246.

exposed,[24] and (2) children presenting emotional and behavioral challenges in schools because of their family members' use of opioids.

55.     Plaintiffs and the Class will continue to incur significant costs in the years to come as the current and future cohorts of adversely impacted children come of school age and move from lower school to high school with special needs all along the way.

56.     The Class is defined as: All independent public school districts in the State of Ohio.

57.     Plaintiffs may amend or modify their Class allegations as the case progresses, including by adding or narrowing class definitions or subclasses or adding or narrowing common questions or issues for classwide adjudication.

58.     Numerosity. The potential members of the Class are so numerous that joinder of all members is unfeasible and not practicable.

59.     Commonality and Predominance. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

        a.     McKinsey's conduct in creating, urging, and implementing marketing, promotion, distribution, and sales strategies for opioids after Purdue's first guilty plea in 2007;

        b.     Whether McKinsey disregarded the risks created by its strategies for "turbocharging" opioid sales in 2013 and later;

---

[24] Paul Morgan and Yangyang Wang, *The Opioid Epidemic, Neonatal Abstinence Syndrome, and Estimated Costs for Special Education Services*, 25 American Journal of Managed Care 13 (2019).

c.      Whether McKinsey's developing, urging, and implementing its opioid strategies with Purdue and other opioid manufacturers it worked with caused or contributed to an increase in opioid addiction and abuse and the effects alleged;

d.      Whether McKinsey's conduct with respect to developing, urging, and implementing nationwide opioid sales, including in Ohio, was negligent, grossly negligent, reckless, or intentional;

e.      Whether McKinsey's conduct with respect to developing, urging, and implementing nationwide opioid sales, including in Ohio, caused or contributed to causing a public nuisance;

f.      Whether McKinsey's conduct with respect to developing, urging, and implementing nationwide opioid strategies resulted in false misrepresentations to prescribers, including those in Ohio, regarding opioids;

g.      Whether McKinsey aided and abetted and/or conspired with Purdue, Rhodes, the Sacklers, and other opioid manufacturers it worked with in developing, urging, and implementing its opioid strategies;

h.      Whether McKinsey's actions, as set out in this Complaint, caused an increase in the number of children born with *in utero* opioid exposure;

i.      Whether children affected by opioid usage *in utero* require special education services and other supports in public schools; and

j.      Whether opioid addiction or use disorder in the home increases the risk that a student will present emotional and behavioral difficulties in school .

60. _Typicality_. The claims of the named Plaintiffs are typical of the Class's claims. Plaintiffs and the Class have sustained damages arising out of and caused by McKinsey's unlawful conduct as alleged in this Complaint.

61. _Adequacy of Representation_. Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Counsel representing Plaintiffs are competent and experienced in litigating class actions.

62. _Superiority of a Class Action_. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the claims asserted herein. A class action would provide a superior vehicle for resolving the issues for all similarly affected and situated. There will be no difficulty in the management of this action as a class action.

## IX. CLAIMS FOR RELIEF

63. All cases of action are brought on behalf of both Plaintiffs and the Class.

### A. Violation of RICO, 18 U.S.C. § 1961, _et seq._

64. Plaintiffs reallege all of the foregoing allegations and incorporate them by reference.

65. This claim is brought by Plaintiffs against McKinsey for actual damages, treble damages, and available injunctive and/or equitable relief under 18. U.S.C. § 1964, for violations of 18 U.S.C. § 1961, _et seq._, specifically, 18 U.S.C. § 1962(c) and (d).

66. Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce,

to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c).

67. At all relevant times, McKinsey is and has been a "person" under 18 U.S.C. § 1961(3) because it is capable of holding, and does hold, "a legal or beneficial interest in property."

68. Plaintiffs are each "persons," as the term is defined in 18 U.S.C. § 1961(3), and have standing to sue under 18 U.S.C. § 1964(c) as they were and are injured in their business and/or property "by reason of" the RICO Act violations described herein.

69. Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. *See* 18 U.S.C. § 1962(d).

70. McKinsey conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c) and § 1962(d).

**<u>Description of the Enterprise</u>**

71. Section 1961(4) defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

72. Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose. *See Boyle v. United States*, 556 U.S. 938, 946 (2009).

73. Opioid manufacturers, including Purdue, Johnson & Johnson, Janssen, Cephalon, Endo, and Mallinckrodt (collectively the "Opioid Manufacturers"), together with McKinsey, which participated in the marketing and sale of opioids as described in this Complaint,

21

(collectively, the "Opioid Marketing Enterprise Members" or the "Enterprise Members") engaged in a scheme to unlawfully increase sales of opioids—and grow their share of the prescription painkiller market and the market as a whole—through repeated and systematic misrepresentations, concealments, and omissions of material fact about the safety and efficacy of opioids for treating long-term chronic pain, together with other deceptive and fraudulent acts and practices, as described in this Complaint.

74.     In order to unlawfully increase the demand for opioids and thereby increase their own profits despite their knowledge of the harmful effects that would follow, the Opioid Marketing Enterprise Members formed an association-in-fact enterprise (the "Opioid Marketing Enterprise" or the "Enterprise"). The Opioids Manufacturers worked together to accomplish their aims, with McKinsey serving as a go-between that held all of the companies together and helped coordinate the deceptive marketing and sales strategies. Through McKinsey and their own personal relationships, the members of the Opioid Marketing Enterprise had the opportunity to form and take actions in furtherance of the Opioid Marketing Enterprise's common purpose: lying to prescribers and Plaintiffs in order to increase sales of addictive and dangerous drugs and line the enterprise members' pockets. The Opioid Marketing Enterprise Members' substantial financial contributions to the Opioid Marketing Enterprise and the advancement of opioids-friendly messaging fueled the U.S. opioid epidemic.

75.     In the alternative, the association-in-fact Opioid Marketing Enterprise existed just between McKinsey and Purdue, who worked together to unlawfully increase sales of opioids—and grow Purdue's share of the prescription painkiller market—through repeated and systematic misrepresentations about the safety and efficacy of opioids for treating long-term chronic pain. McKinsey knew Purdue was marketing its opioids illegally and fueling an opioid epidemic. Using the knowledge it gained from its work with other opioid manufacturers, McKinsey joined forces with Purdue to turbocharge the opioids market in order to profit from this crisis.

76.     The Controlled Substances Act (the "CSA") and its implementing regulations require that "[e]very person who manufactures, distributes, dispenses, imports, or exports any controlled substance," including opioids, become a "registrant." *See* 21 U.S.C. § 823(a)-(b); 21 C.F.R. § 1301.11(a). These registrants, including opioid manufacturer and distributors, must maintain a system to identify and report suspicious orders, including orders of unusual size or frequency, or orders deviating from a normal pattern, and also must maintain effective controls against diversion of controlled substances. *See* 21 U.S.C. § 823; 21 C.F.R. § 1301.74(b).

77.     Despite these duties, McKinsey and the other Enterprise Members engaged in a scheme with the overarching purpose of materially expanding prescription opioid use by altering the medical community's opioid-prescribing practices, through repeated fraudulent statements and misrepresentations. The Opioid Marketing Enterprise's scheme was sophisticated, well-developed, and fraudulent and was designed to increase the prescription rate for opioid medications that the Enterprise Members knew were dangerous and highly addictive. At all relevant times, McKinsey was aware of the conduct of the Enterprise, was a knowing and willing participant in that conduct, and reaped profits from that conduct in the form of payments from other Enterprise Members as a reward for work done to increase sales and distribution of prescription opioids.

**The Common Purpose and Scheme of the Opioid Marketing Enterprise.**

78.     The Opioid Marketing Enterprise Members, through the Opioid Marketing Enterprise, concealed the true risks and dangers of opioids from the medical community and Plaintiffs and made misleading statements and misrepresentations about opioids that downplayed the risk of addiction and exaggerated the benefits of opioid use. These  included misrepresentations that: (1) that addiction is rare among patients taking opioids for pain; (2) that addiction risk can be effectively managed; (3) that symptoms of addiction exhibited by opioid patients are actually symptoms of an invented condition, which the Opioid Marketing Enterprise

23

Members named "pseudoaddiction"; (4) that withdrawal is easily managed; (5) that increased

dosing presents no significant risks; (6) that long-term use of opioids improves function; (7) that

the risks of alternative forms of pain treatment are greater than the adverse effects of opioids; (8)

that use of time-released dosing prevents addiction; and (9) that abuse-deterrent formulations

provide a solution to opioid abuse.

79.     The scheme devised, implemented, and conducted by the Opioid Marketing

Enterprise Members was a common course of conduct designed to ensure that Opioid Marketing

Enterprise Members unlawfully increased their sales and profits through concealment and

misrepresentations about the addictive nature and effective use of the Opioid Manufacturers'

drugs. The Opioid Marketing Enterprise Members acted together for a common purpose and

perpetuated the Opioid Marketing Enterprise's scheme.

80.     There was regular communication between the Opioid Marketing Enterprise

Members in which information was shared, misrepresentations were coordinated, and payments

were exchanged. The Opioid Marketing Enterprise Members functioned as a continuing unit for

the purpose of implementing the Opioid Marketing Enterprise's scheme and common purpose,

and each agreed and took actions to hide the scheme and continue its existence.

81.     As public scrutiny and media coverage focused on how opioids ravaged

communities throughout the United States, McKinsey did not challenge Purdue or other

manufacturers' misrepresentations, seek to correct their previous misrepresentations, terminate

its role in the Opioid Marketing Enterprise, or disclose publicly that the risks of using opioids for

chronic pain outweighed their benefits and were not supported by medically acceptable evidence.

Instead, despite its knowledge of the ongoing fraud and the danger it posed, McKinsey continued

to participate in the Opioid Marketing Enterprise for financial gain.

82.     The impact of the Opioid Marketing Enterprise's scheme is still in place—opioids continue to be prescribed and used for chronic pain throughout the United States, and the epidemic continues to injure Plaintiffs and consume Plaintiffs' resources.

83.     The Opioid Marketing Enterprise Members, including McKinsey, were each willing participants in the Opioid Marketing Enterprise, had a common purpose and interest in the object of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose.

**The Conduct of the Opioid Marketing Enterprise Violated Civil RICO.**

84.     From at least 2004 to the present, each of the Opioid Marketing Enterprise Members played some part in directing the affairs of the Opioid Marketing Enterprise and participated in operating or managing of the affairs of the Opioid Marketing Enterprise, directly or indirectly, by:

a.     Creating and providing a body of deceptive, misleading, and unsupported *medical and popular literature* about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

b.     Creating and providing a body of deceptive, misleading, and unsupported *electronic and print advertisements* about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

c.     Creating and providing a body of deceptive, misleading, and unsupported *sales and promotional training materials* about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

25

d.      Devising and implementing marketing schemes that included targeting and misleading physicians, unlawfully incentivizing sales representatives to maximize prescriptions and dosages, and evading regulatory constraints; and

e.      Disseminating many of their false, misleading, imbalanced, and unsupported statements through unbranded materials that appeared to be independent publications.

85.      The scheme devised and implemented by the Opioid Marketing Enterprise Members amounted to a common course of conduct intended to enrich themselves by increasing sales of prescription opioids by convincing doctors to prescribe and patients to use opioids, including for long-term chronic pain, despite the Opioid Marketing Enterprise Members' knowledge of the addictions and deaths that would occur as a result. The scheme was a continuing course of conduct, and many aspects of it continue through to the present.

**The Opioid Marketing Enterprise Members Conducted or Participated, Directly or Indirectly, in the Conduct of the Enterprise's Affairs.**

86.      "[T]o conduct or participate, directly or indirectly, in the conduct" of an enterprise, "one must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993).

87.      As described herein, the Opioid Marketing Enterprise Members participated in the conduct of the Enterprise through a pattern of racketeering activity, and McKinsey was the mastermind of marketing schemes deployed by the Enterprise members to defraud prescribers and Plaintiffs by using the mail and wires in furtherance of plans that were designed with specific intent to defraud.

88.      The Opioid Marketing Enterprise Members conducted an association-in-fact enterprise and/or participated in the conduct of an enterprise through a pattern of illegal activities (the predicate racketeering acts of mail and wire fraud) to carry out the common purpose of the

Opioid Marketing Enterprise, i.e., to unlawfully increase profits and revenues from the continued prescription and use of opioids for long-term, chronic pain. Through the racketeering activities of the Opioid Marketing Enterprise, the Opioid Marketing Enterprise Members sought to further the common purpose of the Enterprise through a fraudulent scheme to change prescriber habits and public perception about the safety and efficacy of opioids use. In so doing, each of the Opioid Marketing Enterprise Members knowingly conducted and participated in the conduct of the Enterprise by engaging in mail and wire fraud, in violation of 18 U.S.C. §§ 1962(c) and (d).

89.     The Opioid Marketing Enterprise is an association-in-fact enterprise that consists of the Opioid Marketing Enterprise Members.

90.     Each of the Opioid Marketing Enterprise Members conducted and participated in the conduct of the Opioid Marketing Enterprise by playing a distinct role in furthering the Enterprise's common purpose of increasing profits and sales through the knowing and intentional dissemination of false and misleading information about the safety and efficacy of long-term opioid use, and the risks and symptoms of addiction, in order to increase the market for prescription opioids by changing prescriber habits and public perceptions.

91.     Specifically, the Opioid Marketing Enterprise Members each worked together to coordinate the Enterprise's goals and conceal their role, and the Enterprise's existence, from prescribers and Plaintiffs by, among other things, (i) funding, editing, and distributing publications that supported and advanced their false messages; (ii) funding key opinion leaders ("KOLs") to further promote their false messages; and (iii) tasking their own employees to direct deceptive marketing materials and pitches directly at physicians.

92.     Further, the Opioid Marketing Enterprise Members had systematic links to and personal relationships with each other through joint participation in lobbying groups, trade industry organizations, contractual relationships, and continuing coordination of activities. The systematic links and personal relationships that were formed and developed allowed the Opioid

27

Marketing Enterprise Members the opportunity to form the common purpose and agree to conduct and participate in the conduct of the Opioid Marketing Enterprise. Specifically, each of the Opioid Marketing Enterprise Members coordinated their efforts through the same KOLs and front groups, based on their agreement and understanding that the front groups and KOLs were industry friendly and would work together with the Opioid Marketing Enterprise Members to advance the common purpose of the Opioid Marketing Enterprise. Each of the individuals and entities who formed the Opioid Marketing Enterprise acted to enable the common purpose and fraudulent scheme of the Opioid Marketing Enterprise.

93.    At all relevant times, the Opioid Marketing Enterprise: (a) had an existence separate and distinct from each Opioid Manufacturer and its members; (b) was separate and distinct from the pattern of racketeering in which the Opioid Marketing Enterprise Members engaged; (c) was an ongoing and continuing organization consisting of individuals, persons, and legal entities, including each of the Opioid Marketing Enterprise Members; (d) was characterized by interpersonal relationships between and among each member of the Opioid Marketing Enterprise; and (e) had sufficient longevity for the Enterprise to pursue its purpose; and (f) functioned as a continuing unit.

94.    The Opioid Marketing Enterprise Members conducted and participated in the conduct of the Opioid Marketing Enterprise through a pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud), to increase profits and revenue by changing prescriber habits and public perceptions in order to increase the prescription and use of prescription opioids and expand the market for opioids.

95.    The Opioid Marketing Enterprise Members each committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years. The multiple acts of

racketeering activity that the Opioid Marketing Enterprise Members committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the Opioid Marketing Enterprise Members' regular use of the facilities, services, distribution channels, and employees of the Opioid Marketing Enterprise, the U.S. Mail, and interstate wire facilities. The Opioid Marketing Enterprise Members participated in the scheme to defraud by using mail, telephones, and the internet to transmit communications and payments in interstate or foreign commerce.

**The Conduct was More than a Typical Business Relationship.**

96.     There were strong relationships among those associated with the Opioid Enterprise and sufficient longevity among Enterprise associates to pursue the Enterprise's common purpose. The common purpose was to increase opioid revenues unlawfully by misrepresenting and lying about opioids in order to changing prescriber habits and the perception regarding the safety and efficacy of opioids for chronic pain and long-term use. The Enterprise's deceit was, in part, in its failure to disclose that increasing strength and dosing actually increased the risk of addiction and overdose and that patients on opioids for more than a brief period develop tolerance, requiring increasingly high doses to achieve pain relief.

97.     The Opioid Marketing Enterprise was more than a typical business relationship. Rather, the members of the Enterprise knew that opioids were addictive and causing serious harm to people and communities but chose to work together to lie to prescribers and Plaintiffs about these drugs in order to increase their bottom lines. McKinsey worked closely with the Opioid Manufacturers to achieve these aims. McKinsey, as an advisor of multiple Opioid Manufacturers, also had access to information about multiple players and was able to coordinate the fraud occurring across the Enterprise. As discussed below, McKinsey was particularly embedded in Purdue's organizational structure and the relationship's longevity was sufficient to

29

pursue the Enterprise's purposes. During the 2009-2014 period in particular, Purdue relied extensively on McKinsey to develop its sales and marketing strategy for OxyContin.

98.     The intent to defraud is evident in McKinsey's attempts to strengthen its relationship with Purdue and assist Purdue in selling opioids after Purdue's 2007 criminal guilty plea. As part of the guilty plea, Purdue admitted that its "supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medication."[25]  But rather than be deterred by this, McKinsey dove in. During the 2009-2014 period in particular, Purdue relied extensively on McKinsey to develop its sales and marketing strategy for OxyContin. McKinsey worked closely with Purdue on both the creation and implementation of OxyContin's sales strategy.

99.     McKinsey continued to work with Purdue on strategies to boost the sales of its opioid products, in particular OxyContin, through 2017, when Purdue, which soon would be facing hundreds of lawsuits arising out of its role in the opioid epidemic, reduced its investment in sales.

100.     Thereby, even after the 2007 guilty plea, Purdue, with McKinsey's aid, saw growing profits from opioid sales. In 2015 alone, Purdue obtained $3 billion in annual opioid sales—a four-fold increase from its 2006 sales of $800 million.

101.     McKinsey's relationship with Purdue went far beyond a typical business relationship. McKinsey worked closely with Purdue on both the creation and implementation of OxyContin's sales strategy, a strategy McKinsey knew had been based on misleading and defrauding doctors and patients alike about a dangerous and highly addictive drug.

---

[25] Information at pp. 5-6, *United States v. Purdue Frederick Co.*, No. 07-cr-29-JPJ (W.D. Va. May 10, 2007), Doc. 5.

102. Further, McKinsey had access to detailed prescribing information enabling it to determine if there were suspicious or problematic prescribing patterns. Rather than using this information to help its clients prevent diversion of controlled substances, McKinsey and the Opioid Marketing Enterprise used this information in furtherance of their scheme to defraud prescribers and Plaintiffs, target and increase sales to prescribers who were overprescribing, and continue to fuel opioid addiction and the resulting epidemic.

## The Fraudulent Schemes

103. As detailed above, the operation of the Opioid Marketing Enterprise, included several schemes to defraud that helped to further the goals of its members—i.e., to expand the market and increase profits and sales through the knowing and intentional dissemination of false and misleading information about the safety and efficacy of long-term opioid use, and to increase profits for the Enterprise Members via expanding the market for opioids.

## Fraudulent Marketing Scheme: Deceptive Messaging Regarding Opioid Use

104. As described throughout, McKinsey sought to unlawfully increase profits and revenues from the continued prescription and use of opioids for long-term, chronic pain by changing prescriber habits and public perception regarding the safety and efficacy of opioids. McKinsey's fraud specifically targeted prescribers and set out to convince them that they should prescribe more and more opioids, overcoming what could otherwise be a check on opioid manufacturers' ability to increase sales of addictive products.

105. Despite McKinsey knowing that reformulated OxyContin could still be abused, in furtherance of the scheme to defraud, McKinsey spread messages that prescribing opioids could provide "freedom" and "peace of mind" for its users and that physicians could "tailor the dose."

106. After Purdue's 2007 criminal plea for illegally marketing OxyContin, McKinsey created strategies to repair Purdue's reputation and boost OxyContin sales. In 2008, Purdue

submitted a New Drug Application for a reformulation of OxyContin, ostensibly to make it more difficult to abuse by extracting the active ingredient from it or otherwise defeating the time-release mechanism in OxyContin tablets—i.e., another product Purdue would later deceptively promote as safer than and less prone to abuse than it was.

107.    In June 2009, McKinsey helped Purdue prepare for an FDA advisory committee meeting.

108.    McKinsey and the other Opioid Marketing Enterprise Members knew the changes Purdue made would not make opioids non-addictive or prevent them from being used to create and further substance abuse problems. For example, in 2009, the FDA noted in permitting ADF labeling that "the tamper-resistant properties will have no effect on abuse by the oral route (the most common mode of abuse)." Similarly, in approving reformulated OxyContin, the FDA cautioned that the reformulation "is not completely tamper resistant and those intent on abusing this new formulation will likely find a means to do so. In addition, the product can still be misused or abused and result in overdose by simply administering or ingesting larger than recommended oral doses."[26]

109.    Despite this knowledge, the Opioid Marketing Enterprise pursued messaging and a strategy that was deceptive and was designed to deceive doctors in particular. Even after Purdue pleaded guilty to offenses related to its marketing and distribution of addictive opioids, McKinsey advised Purdue to market OxyContin to encourage more prescriptions (that it knew would lead to abuse and overdose events) into higher dose prescriptions by a smaller number of loyalist prescribers.

110.    Far from the deception of doctors being an unforeseen consequence, McKinsey intentionally set out to target doctors as a cog in the Enterprise's scheme to defraud. Indeed,

---

[26] FDA Summary Review, https://www.accessdata.fda.gov/drugsatfda_docs/nda/2010/022272s000SumR.pdf.

deceiving doctors was part of the marketing scheme, and doctors were utilized in furtherance of the marketing scheme. Medical providers were not a break in the causal chain of harm to Plaintiffs but were targeted players in the scheme to defraud and key links in the casual chain.

111.    The marketing scheme involved using data to target high prescribers and training marketers to make misleading statements with the goal to increase high dose prescriptions, which McKinsey and Opioid Marketing Enterprise Members knew were more likely to be abused. Enterprise Members knew that overdoses were expected and that such overdoses would lead to the need for increased services.

112.    Purdue's 2020 guilty plea acknowledged its role in using aggressive marketing to convince doctors to prescribe opioids unnecessarily, fueling the drug addiction crisis. McKinsey was the mastermind of the marketing scheme following Purdue's 2007 guilty plea. McKinsey developed and helped implement these strategies.

113.    As detailed throughout, McKinsey and Opioid Marketing Enterprise Members were aware of the catastrophic injury inflicted on the public by selling harmful, addictive opioid products. Yet when promoting opioids and engaging in doctor detailing, the Enterprise Members intentionally hid the potential for abuse and addiction by marketing OxyContin's 12-hour dosing as meaning that users only need to take OxyContin twice a day, thus requiring fewer pills.

114.    It was foreseeable that this marketing strategy would lead to greater addiction because OxyContin wore off after 8 to 10 hours in many patients. Prescribing 12-hour dosing led to "end of dose failure," which led to a vicious cycle that became "the perfect recipe for

addiction."[27] As a result, what McKinsey marketed as "convenient" led to what was described as "a [d]escription of Hell."[28]

115.    The marketing scheme worked. Nationwide, based on an analysis by the Los Angeles Times, more than 52% of patients taking OxyContin longer than three months are on doses greater than 60 milligrams per day—which converts to the 90 morphine equivalent dose that the CDC Guideline urges prescribers to "avoid" or "carefully justify."[29]

116.    A key element of the marketing scheme that fueled the deadly epidemic of opioid abuse was using detailed prescriber data.

**Data Scheme: Use of Prescriber Data for Intentional Targeting of High Opioid Prescribers-Not Diversion Prevention**

117.    McKinsey was an advisor to DEA registrants and Opioid Marketing Enterprise Members, who had a legal duty to guard against diversion and report suspicious orders of controlled substances. Rather than assisting in reporting suspicious orders, McKinsey used its position and access to detailed prescriber information to actually divert resources to target high volume prescribers to sell more opioids.

118.    Distributors of controlled substances have a legal duty to report suspicious orders, and to report those that deviate substantially from a normal pattern and orders of unusual size and frequency. *See* 21 U.S.C. § 823; 21 C.F.R. § 1301.74(b). These obligations included a legal duty to maintain effective controls and procedures to guard against diversion of controlled substances and a legal duty to maintain a system to identify and report suspicious orders of controlled substances. *See* 21 C.F.R. §§ 1301.7(a) (b); 1301.74(b). Rather than advising their

---

[27] Harriet Ryan, "' *You Want a Description of Hell?' OxyContin's 12-Hour Problem*," Los Angeles Times, May 5, 2016, available at http://www.latimes.com/projects/oxycontin-part1/.

[28] *Id.*

[29] CDC Guideline at 16.

registrant clients on how to comply with their legal duties to maintain effective controls to guard against diversion and how to operate a system to identify and report suspicious orders, in furtherance of the scheme, McKinsey and the Opioid Marketing Enterprise Members used detailed data to target prescribers to increase the opioid market.

119.    McKinsey received physician-level sales data to develop its marketing strategy to increase OxyContin performance after Purdue's 2007 guilty plea. Rather than using this access to the granular data to avoid diversion and to prevent Enterprise members from targeting prescribers with suspicious prescribing patterns, McKinsey used this information to help the Opioid Marketing Enterprise members push more opioids on high volume prescribers in furtherance of its schemes to defraud. The targets were chosen based on their history of prescribing high doses of opioids in large quantities.

120.    One of the services the Enterprise used in furtherance of this scheme concerned the use of data to help Purdue meet its goals. McKinsey had detailed information from which it could discern, as could Purdue, whether a prescriber had problematic patterns suggesting operation as a "pill mill," including a shift to other opioids after OxyContin's reformulation. Yet, McKinsey urged Purdue to target, and seek to increase the prescribing of, all of these prescribers from whom it perceived Purdue could obtain greater profits.

121.    The Opioid Marketing Enterprise used data for intentional targeting of high prescribers and not for diversion prevention. McKinsey advised Purdue to raise sales of Oxycontin by focusing on high dose sales and deceptively messaging to physicians that OxyContin would improve function and quality of life. McKinsey urged Purdue to maximize sales by dictating which prescribers its sales representatives would target.

122.    McKinsey targeted not just doctors but also nurse practitioners and physician assistants.

123.     The Enterprise's scheme also explored ways to increase the amount of time sales representatives spent in the field increasing opioid sales, and prioritizing OxyContin in incentive compensation targets.

124.     By April 24, 2014, the plan was working.

125.     McKinsey ensured Purdue would benefit from the lessons learned by other Enterprise members. Likewise, McKinsey recommended physician targeting to other Enterprise members, including Endo and Janssen.

126.     By targeting physicians based on their prescribing patterns, the Opioid Marketing Enterprise was working toward the common purpose of deceptively convincing doctors to prescribe more opioids and thereby increase their own profits.  McKinsey advised that Purdue would see a greater return on its sales investment by focusing its targets, including on prescribers with alarming prescribing patterns that raised red flags they were writing "prescriptions" for non-medical use. The plan aimed at boosting sales of OxyContin by targeting the highest volume opioid prescribers, which McKinsey and the other members of the Opioid Marketing Enterprise knew and/or should have known would result in the expansion of the illicit opioid market.

127.     The Enterprise sought to grow opioid sales to prescribers who raised red flags of diversion and orders it knew or should have known were likely to be diverted or fuel an illegal market. Purdue had a legal obligation not to target these prescribers; rather, it was obligated to report their conduct to law enforcement. Yet the Enterprise used access to prescriber data not to report diversion but to enhance diversion.

**Pattern of Racketeering Activity**

128.     McKinsey, together with the other Opioid Marketing Enterprise Members, engaged in a scheme to unlawfully increase sales of opioids—and grow their share of the prescription painkiller market—through repeated and systematic misrepresentations about the

36

safety and efficacy of opioids for treating long-term chronic pain. As a unique consulting entity with knowledge of both the addictive properties and abuse potential of opioids and with access to data regarding internal prescribing behaviors of its targets, McKinsey perpetrated a number of fraudulent schemes using the mails and wires, including advising Purdue to market more opioids, in higher doses, to high volume prescribers while helping Purdue avoid mandatory prescriber education regarding the risks of opioids. McKinsey fueled the epidemic alongside its clients. Through targeted marketing that McKinsey worked to develop, "turbocharge," and implement, McKinsey substantially contributed to an explosion in the use of opioids across the United States. McKinsey is an enterprise that is engaged in and affects interstate commerce because the company advised opioid manufacturers on the sale of opioid products across the United States, as alleged herein.

129.    The Opioid Marketing Enterprise Members devised and knowingly carried out this illegal scheme and artifice to defraud by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts regarding the safe, non-addictive and effective use of opioids for long-term chronic, non-acute, and non-cancer pain. They knew that these representations deviated from the FDA-approved use of these drugs and were not supported by actual evidence. The Opioid Marketing Enterprise Members intended that their common purpose and scheme to defraud would, and did, deceive consumers, prescribers, regulators, Plaintiffs, and other intended victims and they used the U.S. Mail and interstate wire facilities with the specific intent to advance, and for the purpose of executing, their illegal scheme.

130.    By intentionally concealing the material risks and affirmatively misrepresenting the benefits of using opioids for chronic pain, the Opioid Marketing Enterprise Members engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

131.    To achieve the common goal and purpose of the Opioid Marketing Enterprise, the Opioid Marketing Enterprise Members hid from the consumers, prescribers, regulators, and Plaintiffs: (a) the fraudulent nature of the Opioid Marketing Enterprise Members' marketing scheme; (b) the fraudulent nature of statements made by the Opioid Marketing Enterprise Members regarding the safety and efficacy of prescription opioids; and (c) the true nature of the relationship between the members of the Opioid Marketing Enterprise.

132.    The Opioid Marketing Enterprise Members with knowledge and intent, to the overall objective of the Opioid Marketing Enterprise Members' fraudulent scheme and participated in the common course of conduct to commit acts of fraud and indecency in marketing prescription opioids.

133.    Indeed, for the Opioid Marketing Enterprise Members' fraudulent scheme to work, each of them had to agree to implement similar tactics regarding fraudulent marketing of prescription opioids. This coordination was accomplished via their relationships with each other and via McKinsey's relationships and contacts with key opioids manufacturers.

134.    The Opioid Marketing Enterprise Members' predicate acts all had the purpose of creating the opioid epidemic that substantially injured Plaintiffs, while simultaneously generating billion-dollar revenues and profits for the Opioid Marketing Enterprise Members. The predicate acts were committed or caused to be committed by the Opioid Marketing Enterprise Members through their participation in the Opioid Marketing Enterprise and in furtherance of its fraudulent scheme.

135.    The Opioid Marketing Enterprise Members' scheme described herein was perpetrated, in part, through multiple acts of mail fraud and wire fraud, constituting a pattern of racketeering activity. McKinsey in particular used mail and wire transmission, directly or indirectly, in furtherance of this scheme by transmitting deliberately false and misleading statements to prescribers and the public.

38

136.    McKinsey had a specific intent to deceive and defraud prescribers, regulators, and Plaintiffs. For example, as alleged above, McKinsey made repeated and unequivocal statements through the mails and wires that were false and misleading. McKinsey advised Purdue to market OxyContin based on the false and misleading notion that the drug can provide "freedom" and "peace of mind" for its users, and concomitantly reduce stress and isolation.

137.    Similarly, they caused to be transmitted through the mails and wires false and misleading statements regarding the addiction potential of opioids. Moreover, McKinsey had direct involvement in marketing statements and thus caused the statements to be made, notwithstanding that they knew they were false for the reasons detailed above.

138.    The marketing scheme is especially egregious since the public relies on physicians as a position of trust and authority in the community regarding their health and well-being. McKinsey intentionally deceived physicians regarding the abuse potential of opioids. It intended prescribers and the public to rely on its false statements. McKinsey intended reliance on these false statements as it was their goal for doctors to prescribe more and higher quantities of these dangerous pills to the public. This scheme was therefore reasonably calculated to deceive not only persons of ordinary prudence and comprehension but also educated physicians in a place of high trust in the community.

**Predicate Acts**

139.    To carry out, or attempt to carry out, the scheme, the Enterprise Members, each of whom is a person associated-in-fact with the Enterprise, did knowingly conduct or participate in, directly or indirectly, the affairs of the Enterprise through a pattern of racketeering activity

within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

140.    Specifically, the Enterprise Members have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

141.    The multiple acts of racketeering activity which the Enterprises Members committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

142.    The racketeering activity was made possible by the Enterprise's regular use of the facilities, services, distribution channels, and employees of the Enterprise Members.

143.    The Opioid Marketing Enterprise Members participated in the schemes by using mail, telephone, and the internet to transmit mailings and wires in interstate or foreign commerce.

144.    The Enterprise Members used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their schemes through common misrepresentations, concealments, and material omissions.

145.    In devising and executing the illegal schemes, the Opioid Marketing Enterprises Members devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiffs and prescribers and to obtain money by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts.

146.    For the purpose of executing the illegal schemes, the Enterprise Members committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal schemes.

40

147.     The Opioid Marketing Enterprise Members' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to the conduct described in the Factual Allegations section of this Complaint, and:

148.     Mail Fraud: The Opioid Marketing Enterprise Members violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

149.     Wire Fraud: The Opioid Marketing Enterprise Members violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

150.     The Opioid Marketing Enterprise Members' use of the U.S. Mail and interstate wire facilities to perpetrate the opioids marketing scheme involved thousands of separate instances of the use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful Opioid Marketing Enterprise, including essentially uniform misrepresentations, concealments, and material omissions regarding the beneficial uses and non-addictive qualities for the long-term treatment of chronic, non-acute, and non-cancer pain, with the goal of profiting from the increased sales of the Opioid Marketing Enterprise Members' drugs that occurred because consumers, prescribers, regulators, and Plaintiffs relied on the Opioid Marketing Enterprise Members' misrepresentations. These uses of the U.S. Mail or interstate wires included, inter alia:

151.     Marketing materials about opioids and their risks and benefits, which the Opioid Marketing Enterprise Members sent to health care providers, transmitted through the internet and

41

television, and published across the country, including in counties and cities and on Tribal Reservations and to Plaintiffs.

152.    Written representations and telephone calls among the Opioid Marketing Enterprise Members and between the Opioid Marketing Enterprise Members regarding the misrepresentations, marketing statements, and claims about opioids, including the non-addictive, safe use of opioids for chronic, long-term pain generally;

153.    E-mails, telephone calls, and written communications among the Opioid Marketing Enterprise Members agreeing to or implementing the opioids marketing scheme;

154.    Communications among the Opioid Marketing Enterprise Members and between the Opioid Marketing Enterprise Members and the media regarding the publication, drafting, and dissemination of treatment guidelines as part of the Opioid Marketing Enterprise;

155.    Written and oral communications directed to prescribers, the public, and Plaintiffs that fraudulently misrepresented the risks and benefits of using opioids for chronic pain; and

156.    Receipts of increased profits sent through the U.S. Mail and interstate wire facilities—the wrongful proceeds of the scheme.

157.    Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities are not obtainable (e.g., each time a McKinsey trained marketer "calls" or reached out to a physician using the mails or wires in furtherance of the marketing scheme). Because the Opioid Marketing Enterprise Members disguised their participation in the Enterprise, and worked to keep the Enterprise's existence secret, many of the precise dates of the Opioid Marketing Enterprise's uses of the U.S. Mail and interstate wire facilities (and corresponding predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to the books and records maintained by the Opioid Marketing Enterprise Members. Indeed, an essential part of the successful operation of the Opioid Marketing Enterprise alleged herein

depended upon secrecy. Plaintiffs have, however, described the types of predicate acts of mail and/or wire fraud, including the specific types of fraudulent statements upon which, through the mail and wires, McKinsey engaged in fraudulent activity in furtherance of their scheme.

158.    Below, Plaintiffs also describe examples of occasions on which the Opioid Marketing Enterprise Members disseminated misrepresentations and false statements to consumers, prescribers, regulators, and Plaintiffs, and how those acts were in furtherance of the scheme.

| From | To | Date | Description |
|------|-----|------|-------------|
| Purdue | Prescribers and Plaintiffs | 2007 | Statements that pain relief from opioids improves patients' function and quality of life in advertising and a book |
| Purdue | Prescribers | Continuous | Telephonic and electronic communications by its sales representatives indicating that opioids will improve patients' function |
| Purdue | FDA advisory committee | September 2009 | Presentation prepared by McKinsey indicating that its reformulated OxyContin will deter abuse |
| Purdue | Prescribers and Plaintiffs | 2010 onwards | Statements that the reformulated OxyContin will deter abuse and therefore doctors can continue to safely prescribe opioids |
| Purdue | Prescribers and Plaintiffs | 2010-2020 | Statements from Purdue at McKinsey's direction that opioids can provide "freedom," "peace of mind," and give patients "the best possible chance to live a full and active life" |
| Purdue | Prescribers and Plaintiffs | Advertising produced in 2016 | Advertising from Purdue that "We sell hope in a bottle." |
| Purdue | Prescribers and Plaintiffs | 2010 onwards | Statements that OxyContin's 12-hour dosing would allow patients to only need to take OxyContin twice a day, thus requiring fewer pills |
| Purdue | Prescribers and Plaintiffs | 2013 onwards | Statements from Purdue at McKinsey's direction that OxyContin allowed physicians to "Individualize the Dose" and that the dose of OxyContin can safely be increased or tailored as the patients adapt to a certain dose |
| Endo | Prescribers and Plaintiffs | 2009 | Statements made on an Endo-sponsored website, PainKnowledge.com, indicating that patients who take opioids as prescribed usually do not become addicted |
| Endo | Prescribers and Plaintiffs | 2009 | Statements made on another Endo-sponsored website, PainAction.com, indicating that most chronic pain patients do not become addicted to opioid medications |
| Endo | Prescribers and Plaintiffs | Various | Statements in pamphlets and publications described by Endo indicating that most people who take opioids for pain relief do not develop an addiction |

| Endo | Prescribers and Plaintiffs | Various | Statements made on the Endo-run website, Opana.com, indicating that opioid use does not result in addiction |
|---|---|---|---|
| Endo | Prescribers and Plaintiffs | Various | Statements made on the Endo-run website, Opana.com, indicating that opioid dependence can be addressed by dosing methods such as tapering |
| Endo | Prescribers and Plaintiffs | Various | Statements made on its website, PainKnowledge.com, that opioid dosages could be increased indefinitely |
| Endo | Prescribers and Plaintiffs | Various | Statements made in a publication entitled "Understanding Your Pain: Taking Oral Opioid Analgesics" suggesting that opioid doses can be increased indefinitely |
| Endo | Prescribers | Various | Electronic and telephonic communications to its sales representatives indicating that the formula for its medicines is "crush resistant" |
| Endo | Prescribers and Plaintiffs | 2007 | Statements that pain relief from opioids improves patients' function and quality of life in advertising and a book |
| Endo | Prescribers | Various | Telephonic and electronic communications by its sales representatives indicating that opioids will improve patients' function |
| Janssen | Prescribers and Plaintiffs | Various | Statements on its website, PrescribeResponsibly.com, indicating that concerns about opioid addiction are overestimated |
| Janssen | Prescribers and Plaintiffs | 2009 | Statements in a 2009 patient education guide claiming that opioids are rarely addictive when used properly |
| Janssen | Prescribers and Plaintiffs | 2009 | Statements included on a 2009 Janssen-sponsored website promoting the concept of opioid pseudoaddiction |
| Janssen | Prescribers and Plaintiffs | Various | Statements on its website, PrescribeResponsibly.com, advocating the concept of opioid pseudoaddiction |
| Janssen | Prescribers and Plaintiffs | Various | Statements on its website, PrescribeResponsibly.com, indicating that opioid addiction can be managed |
| Janssen | Prescribers and Plaintiffs | 2009 | Statements in its patient education guide indicating the risks associated with limiting the dosages of pain medicines |

159. Each of these fraudulent mailings and interstate wire transmissions constitutes racketeering activity and collectively, these violations constitute a pattern of racketeering activity, through which the Opioid Marketing Enterprise Members defrauded and intended to defraud consumers, prescribers, regulators, Plaintiffs, and other intended victims.

44

160.    These were not isolated incidents. Instead, the Opioid Marketing Enterprise Members engaged in a pattern of racketeering activity by committing thousands of predicate acts in a five-year period, in the form of mail and wire fraud, and there remains a threat that such conduct will continue in the future.

161.    Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including consumers, prescribers, regulators, and Plaintiffs. The Opioid Marketing Enterprise Members calculated and intentionally crafted the scheme and common purpose of the Opioid Marketing Enterprise to ensure their own profits remained high. In designing and implementing the scheme, the Opioid Marketing Enterprise Members understood and intended that those in the opioid distribution chain rely on the integrity of the pharmaceutical companies and ostensibly neutral third parties to provide objective and scientific evidence regarding the Opioid Marketing Enterprise Members' products.

162.    Opioid Marketing Enterprise Members' pattern of racketeering activity alleged herein and the Opioid Marketing Enterprise are separate and distinct from each other. Likewise, the Opioid Marketing Enterprise Members are distinct from the Opioid Marketing Enterprise.

163.    The racketeering activities conducted by the Opioid Marketing Enterprise Members amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive consumers, prescribers, regulators, and Plaintiffs. Each separate use of the U.S. Mail and/or interstate wire facilities employed by the Opioid Marketing Enterprise was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including consumers, prescribers, regulators, and Plaintiffs. The Opioid Marketing Enterprise Members have engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Opioid Marketing Enterprise.

45

164.     Each of the Opioid Marketing Enterprise Members aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

165.     As described herein, the Opioid Marketing Enterprise Members engaged in a pattern of related and continuous predicate acts for many years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant money and revenue from the marketing and sale of their highly addictive and dangerous drugs. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

166.     The Opioid Marketing Enterprise Members' violations of law and pattern of racketeering activity directly and proximately caused Plaintiffs' injury in their business and property. The Opioid Marketing Enterprise Members' pattern of racketeering activity logically, substantially, and foreseeably caused an opioid epidemic. The injuries of Plaintiffs, as described herein, were not unexpected, unforeseen, or independent. Rather, the Opioid Marketing Enterprise Members as a whole and McKinsey in particular knew that the opioids were unsuited to treatment of long-term chronic, non-acute, and non-cancer pain, or for any other use not approved by the FDA, and knew that opioids were highly addictive and subject to abuse. Nevertheless, the Opioid Marketing Enterprise Members engaged in a scheme of deception that utilized the mail and wires in order to carry out the Opioid Marketing Enterprise's fraudulent scheme, thereby increasing sales of their opioid products.

167.     It was foreseeable and expected that the Opioid Marketing Enterprise Members creating and then participating in the Opioid Marketing Enterprise through a pattern of racketeering activities to carry out their fraudulent scheme would lead to a nationwide opioid epidemic, including increased opioid addiction and overdose and the injuries that occurred as a result.

**The Enterprise Was Well Aware of Risks of Abuse Before It "Turbocharged" its Marketing Scheme.**

168.     These devastating results were eminently foreseeable by the Opioid Marketing Enterprise Members.

169.     When Purdue pleaded guilty in 2007, it was evident that Purdue's behavior and excessive prescribing were directly linked to a drug addiction crisis that caused severe and extensive damage to America. Purdue's methods included "using aggressive marketing tactics to convince doctors to unnecessarily prescribe opioids – frivolous prescriptions that experts say helped fuel a drug addiction crisis that has ravaged America for decades."[30]

170.     McKinsey cannot deny knowledge regarding Purdue's 2007 guilty plea. At that point, McKinsey knew that opioids were addictive. McKinsey knew that OxyContin was being widely abused and causing harm to people and entities like Plaintiffs. And McKinsey knew that Purdue had been fraudulently marketing OxyContin as less addictive, less subject to abuse, and less likely to cause withdrawal. And yet, years later, in 2013, McKinsey orchestrated a scheme to continue to aggressively promote opioids despite the knowledge that people were still dying from overdoses.

171.     Thus, McKinsey continued to add fuel to this fire by persisting in aggressively marketing to physicians and continuing to fuel the opioid crisis after Purdue's guilty plea. It was foreseeable that continuing to do so would devastate American communities.

---

[30] Jan Hoffman & Katie Benner, *Purdue Pharma Pleads Guilty to Criminal Charges for Opioid Sales*, N.Y. Times (updated Dec. 17, 2020), https://www.nytimes.com/2020/10/21/health/purdue-opioids-criminal-charges.html.

172.     Similarly, news stories across the nation reported additional consequences of wide-scale opioid addiction: needles littered around public property, posing costs to the governments and danger to residents.[31]

173.     The foreseeability of the abuse and need for additional services that would be required following the misleading marketing and increased prescribing and use of high dose opioids is also evidenced by McKinsey's attempt to put a price tag on overdoses. McKinsey suggested payment amounts for event-based contracts: $6,000 to $15,000 (paid to health insurers for increased medical services). Indeed, McKinsey was well aware that increased prescriptions would lead to overdoses and to an additional financial burden for social and health services.

174.     McKinsey is liable for its successful efforts to increase OxyContin sales after Purdue's 2007 guilty plea for misbranding the drug. Indeed, McKinsey's focus on increasing opioid sales after Purdue's guilty was incendiary to escalating and perpetuating the opioid epidemic by (a) using data to specifically target high volume prescribers; (b) persuading sales of higher doses of opioids; (c) tailoring marketing messages to conceal their addictive principles; and (d) by reducing the training of sales representatives.

175.     In 2012, when the consent decree expired (which obligated Purdue to submit annual compliance reports regarding its marketing), McKinsey helped Purdue reengage in its nefarious conduct of targeting and deceiving doctors about the abuse potential of opioids.

176.     After Purdue's guilty plea, McKinsey identified physicians—that had already been influenced by Purdue's misrepresentations and were thus already high prescribers—as optimal targets for a massive marketing push to sell more OxyContin. McKinsey monitored the

---

[31] *See, e.g.*, https://www.bostonglobe.com/metro/regionals/south/2014/10/25/hypodermic-needles-litter-landscape-south-boston/pzgmgbyjYFCD967TePDyiM/story.html.

prescription behaviors of individual doctors and utilized the prescriber-level data and urged Purdue to allocate its time and resources to high prescribing physicians.

177.     By November 2013, McKinsey had obtained the physician-level data it had previously requested and continued to study ways to sell additional OxyContin prescriptions by refining and targeting the sales pitch to them.

178.     In 2013, Project Turbocharge began. McKinsey proposed Project Turbocharge, a marketing strategy to increase opioid sales by hundreds of millions of dollars annually. With McKinsey's assistance, Purdue trained its sales representatives to operate using McKinsey's strategy for selling OxyContin. It is not coincidental to the Enterprise scheme that as soon as the constraints associated with its guilty plea and consent agreement ended, McKinsey assisted Purdue in turbocharging sales.

179.     While McKinsey was pushing hard to turbocharge and promote the sale of opioids, it anticipated and expected that people would die from opioid overdoses. It acknowledged this when in 2017, it proposed that Purdue pay health insurers or other entities in the distribution chain rebates "for every OxyContin overdose attributable to pills they sold."[32]

180.     McKinsey cannot deny that it was aware of the abuse and overdose potential of opioids when it provided estimates for the future costs of overdose or opioid use disorder events.

181.     McKinsey and the other Opioid Marketing Enterprise Members marketed a product, through intentionally deceptive means, that it knew would result in consumer deaths and harm to Plaintiffs. This is not an attenuated causal chain. Rather, aggressively marketing to high prescribing individuals, and training to not fully disclose the risk of abuse, were integral parts of the marketing scheme. Deceptive messaging to targeted prescribers who were likely to prescribe

---

[32] Walt Bogdanich & Michael Forsythe, *McKinsey Proposed Paying Pharmacy Companies Rebates for OxyContin Overdoses*, N.Y. Times (updated Nov. 5, 2021), https://www.nytimes.com/2020/11/27/business/mckinsey-purdue-oxycontin-opioids.html.

more pills in a dose with an anticipated abuse potential was part and parcel of the scheme to defraud.

182.    As a result, Plaintiffs have shouldered the burden of these anticipated increased services and harm to business and property that are inherently tied to opioid abuse and misuse, and both the increased services and harms were reasonably and actually expected from increased prescribing.

183.    The Enterprise's goal was to increase opioid prescribing, and the Enterprise Members knew that doing so would also result in the need for increased medical services. It was also foreseeable that increased prescriptions would also result in increased costs to Plaintiffs and communities throughout the United States.

184.    But for the increase in prescribed opioids, Plaintiffs would not have to expend additional resources or suffered other harm to business and property as a result of harms associated with opioid addiction. The Enterprise persisted in targeting prescribers to prescribe high doses of opioids and knew that doing so would result in adverse health and social outcomes, including overdoses, neo-natal complications, harm to communities like Plaintiffs, hazardous waste in Plaintiff's school districts, as well as and increased expenditures on services to combat such ill effects.

**Plaintiffs' Business and Property Have Been Damaged by the Enterprise's RICO Violations.**

185.    The Opioid Marketing Enterprise's misleading marketing and failure to prevent prescription opioid diversion damaged public school districts, including Plaintiffs. The Opioid Marketing Enterprise's misconduct has contributed to a precipitous rise in babies born addicted to opioids and diagnosed with Neonatal Opioid Withdrawal Syndrome. Babies born with NOWS have a significantly increased risk of developing severe intellectual disabilities that qualify them for, and necessitate, special education and related services in school.

50

186.     Plaintiffs have experienced vast harm to business and property directly, proximately, and foreseeably caused by the racketeering enterprise. Plaintiffs are required by federal law to provide special education services, and thereby incur the increased costs and diversion of resources associated with providing these services to children who were born with NOWS. Plaintiffs have also diverted resources to provide additional support to children presenting emotional and behavioral challenges in school due to opioid addiction or opioid-related death in their families.

187.     The Opioid Marketing Enterprise Members' creation of, and then participation in, the Opioid Marketing Enterprise through a pattern of racketeering activities to carry-out their fraudulent scheme has injured Plaintiffs in the form of substantial losses of money and property that logically, directly, and foreseeably arise from the opioid epidemic. The injuries to Plaintiff, as alleged throughout this complaint, and expressly incorporated herein by reference, include:

a.       Costs associated with providing special education and related services to students who were exposed to opioids in utero and students born with NOWS;

b.       Costs of providing mental health services, treatment, counseling, rehabilitation services, and social services to students with family members who are struggling with opioid use disorder;

c.       Costs associated with providing care for children whose parents suffer from an opioid-related disability, death, or incapacitation; and

d.       Losses caused by diverting revenue and resources that otherwise would have been used to provide other educational services to other students and, because of the conduct of the Opioid Marketing Enterprise must instead be used to support students whose families are struggling with opioid use disorder and provide special education and related services to students who were exposed to opioids in utero and students born with NOWS.

51

188.    These injuries to Plaintiffs were directly and proximately caused by the Opioid Marketing Enterprise Members' racketeering activities, which were the logical, substantial, and foreseeable cause of the injuries to Plaintiff. But for the opioid-addiction epidemic the Opioid Marketing Enterprise Members created through their Opioid Marketing Enterprise, Plaintiffs would not have lost money or property.

189.    Plaintiffs have been injured by the Enterprise's conduct, and such injury would not have occurred but for the predicate acts, which also constitute acts taken in furtherance of the conspiracy pursuant to Section 1962(d). By working to expand the opioid market, fraudulently concealing the abuse potential of opioids, targeting high volume prescribers, and deceiving prescribers and the public in order to allow opioids to continue to remain on the market, the Enterprise caused the expansion of opioid prescribing and caused a large number of people across the United States, and in Plaintiffs' communities to become addicted to opioids. This forced Plaintiffs to expend, time, money, and resources to provide special education and related services to students born with in utero opioid exposure and NOWS and social, emotional, and behavioral supports to students whose families have been negatively impacted by opioid addiction. Indeed, McKinsey intentionally deceived doctors and public health workers in order to continue to grow the opioid market. The repeated fraudulent misstatements by the Defendants contributed to an explosion in the use of opioids across the country. Plaintiffs were direct victims of McKinsey's misconduct. The Enterprise displayed a wanton disregard for public health and safety by intentionally deceiving doctors about the addiction potential of opioids and by marketing higher doses to physicians. This in turn caused an increase in opioid addiction among women, and an increase in children born with in utero opioid exposure and NOWS. The harm created by McKinsey required Plaintiffs to expend financial and other resources to support and educate students born with such afflictions and support students whose families struggled with opioid addiction. The expansion of this market was the goal of the Enterprise and was critical to its success. Therefore, the harm suffered by Plaintiffs to its property and because it was forced to

expend resources beyond ordinary costs of services to combat the opioid epidemic, was directly foreseeable, and in fact, an intentional result of Defendant's misconduct. In fact, McKinsey anticipated overdose events and actually estimated price premiums on these expected overdose events. McKinsey knew that the products it was marketing were highly addictive and could lead to deadly overdoses yet continued to "turbocharge" sales by fraudulently pushing the product on doctors through its deceptive marketing scheme.

190.    The creation and implementation of the marketing scheme that McKinsey developed and deployed through its Enterprise, directly harmed Plaintiffs by imposing costs on their businesses and properties. Plaintiffs' injuries are not solely the result of routine government expenses. Instead, as a result of Defendant's misconduct, Plaintiffs have been and will be forced to go far beyond what a public school district might ordinarily be expected to pay to educate and support students. This includes providing special education and related services to students born with in utero opioid exposure and Neonatal Opioid Withdrawal Syndrome and social, emotional, and behavioral supports to students whose families are negatively impacted by opioids. As a result of the conduct of the Enterprise, Plaintiffs have incurred and will continue to incur costs that far exceed the norm.

191.    The injuries to Plaintiffs were directly and proximately caused by these racketeering activities. These activities were the logical, substantial, and foreseeable cause of the injuries to Plaintiffs. But for the opioid epidemic the Opioid Marketing Enterprise Members created through their Opioid Marketing Enterprise, Plaintiffs would not have lost money or property, and the health and welfare of residents in Plaintiffs' jurisdictions would not have been harmed. Moreover, McKinsey's internal documents show that it actually did foresee many of the harms that resulted from its conduct.

192.    There are no intervening acts or parties that could interrupt the causal chain between Defendant's mail and wire fraud and Plaintiffs' injuries. McKinsey, in furtherance of

the Enterprise's common purpose, caused to be made false and misleading statements directly to the doctors (who consumers rely on to provide health advice) and the public. Doctors are not a break in the causal chain. Instead, the Enterprise members as a whole and McKinsey in particular intentionally targeted doctors and sought to deceive them. That the doctors were then deceived and behaved as the Enterprise wanted, prescribing more and more opioids, was the purpose of the scheme, not an intervening cause.

### B.  Common Law Public Nuisance

193.    Plaintiffs re-allege and incorporate by reference the foregoing allegations as if they were fully set out herein.

194.    McKinsey's conduct has created a foreseeable, ongoing, significant, unlawful, and unreasonable interference with rights common to the general public, including the public health, welfare, safety, peace, comfort, and convenience of Plaintiffs' and the Class's communities through its work in marketing, promoting, distributing, and selling massive doses of opioids throughout the school districts where Plaintiffs and the Class are located, fueling an opioid epidemic in those communities.

195.    By its conduct, McKinsey has knowingly exacerbated an opioid epidemic that affects entire communities, municipalities, towns, school districts, and states, including in Plaintiffs' and the Class's communities. McKinsey knew, or reasonably should have known, that opioids would be used, possessed and/or diverted unlawfully nationwide, including in and around Plaintiffs' and their Class's school district communities.

196.    McKinsey's nuisance-creating conduct has been intentional and unreasonable and/or violated statutes imposing specific legal requirements for the protection of others.

197.    As a direct and proximate result of McKinsey's intentional, unreasonable, and unlawful conduct, Plaintiffs and the Class have suffered damages, including, but not limited to, expenditures to provide special education and other supports and services because of learning

disabilities after children's damaging exposure in utero to opioids and direct costs to Plaintiffs and the Class for health care, disability benefits and workers' compensation.

198.     By incurring pecuniary losses as a result of the increase in children born with NOWS who qualify for special education services due in part to McKinsey's conduct, Plaintiffs and the Class have suffered harm that is different in kind to the harm suffered by the general public.

199.     In the marketing of and efforts to boost sales of opioids in Plaintiffs' and the Class's communities, McKinsey violated federal law, including, but not limited to 18 U.S.C. § 2 and 21 U.S.C. § 846 with respect to Purdue's violation of 21 U.S.C.A. § 823 and 21 C.F.R. § 1301.74.

200.     McKinsey's conduct, if unabated, will continue to threaten the health, safety, and welfare of the students and staff and taxpayers of Plaintiffs' and the Class's school districts. Plaintiffs and the Class have a clearly ascertainable right to abate this nuisance and its effects and seek relief from it.

**C.     Negligence**

201.     Plaintiffs re-allege and incorporate by reference the foregoing allegations as if they were fully set out herein.

202.      McKinsey owed a duty of care to Plaintiffs, under which it was required to exercise reasonable not to cause or encourage the over-marketing, excessive distribution, over-prescribing, or sale of controlled substances, such as opioids, which were known at the time to be addictive and known at the time to be a threat to public health.

203.     McKinsey breached its duty to exercise reasonable care by the conduct alleged in this Complaint.

204.     McKinsey's conduct in breach of its duty caused loss and damage to Plaintiffs and the Class as alleged in this Complaint.

205.    McKinsey's conduct as alleged was reckless and consciously indifferent to the consequences of its actions and inactions and caused loss and damage to Plaintiffs and the Class as alleged above.

206.    As a direct and proximate result of its negligent conduct, McKinsey injured Plaintiffs and the Class, causing them damages.

### D.    Negligence: Violation of Statutory Duties

207.    Plaintiffs re-allege and incorporate by reference the foregoing allegations as if they were fully set out herein.

208.    Reasonably prudent prescription opioid manufacturers, and companies working with them, that had accepted the responsibilities to plan and implement marketing, promoting, distributing, and sales programs would not have misrepresented the risks of prescription opioids, nor overstated their benefits, and would have implemented basic controls—required under federal law—to prevent opioid diversion in the supply chain.

209.    Instead, McKinsey planned and implemented the Purdue and Rhodes programs for the marketing, promotion, distributing, and selling of opioids that enabled Purdue and Rhodes to systematically violate statutory duties related to marketing opioids. These duties required Purdue and Rhodes to maintain effective controls against the diversion of their drugs, to design and operate a system to identify suspicious orders of their drugs, to halt unlawful sales of suspicious orders and to notify the DEA of suspicious orders. McKinsey thus enabled Purdue's and Rhodes' failure to meet the standard of care established by statute by promoting the flow of excessive quantities of prescription opioids into the communities in which Plaintiffs and the Class provide public education to Ohio children and employ Ohio residents. *See, e.g.,* the Controlled Substances Act, 21 U.S.C. § 801 *et seq*; 21 C.F.R. § 1301.74(b).

210.    Every registrant—including Purdue, Rhodes, and other opioid manufacturers—is charged to be vigilant in deciding whether a customer, be it a pharmacy, wholesaler, or end customer, can be trusted to deliver or use controlled prescription narcotics only for lawful

purposes. Specifically, drug manufacturers and distributors are required to maintain effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels. *See* 21 U.S.C. § 823; 21 C.F.R. § 1301.74(b).

211.    McKinsey, in the ways alleged above, enabled Purdue, Rhodes, and other opioid manufacturers to breach their duties to exercise due care in the business of manufacturing, marketing, and wholesale distribution of prescription opioids by filling unreasonably suspect orders over and over again, without imposing proper controls to monitor, identify, investigate, limit, and report suspicious orders for opioids. The very purpose of these duties was to prevent the harms that have directly followed, including the diversion of highly addictive drugs for illegal and/or non-approved purposes. Thus, the McKinsey-designed-and-implemented marketing, promotion, distribution, and sales strategies enabled Purdue, Rhodes, and other opioid manufacturers to accomplish those violations and caused the ensuing harm.

212.    Accordingly, McKinsey enabled Purdue, Rhodes, and other opioid manufacturers to breach their statutory and regulatory established duties of care that were designed specifically to prevent harms from the overuse, abuse, and misuse of controlled substances, including opioids, by failing to use reasonable care, to the significant harm of Plaintiffs and the Class. McKinsey was reckless and acted with conscious indifference to the consequences of its actions and inactions as alleged herein.

### E.    Civil Conspiracy

213.    Plaintiffs re-allege and incorporate by reference the foregoing allegations as if they were fully set out herein.

214.    McKinsey, Purdue, and other opioid manufacturers engaged in a civil conspiracy in their unlawful marketing of opioids and/or efforts to boost the sale of opioids into Plaintiffs' and the Class's communities. McKinsey entered into an agreement with Purdue and other opioid manufacturers to increase the sales of OxyContin by unfair, deceptive, and unconscionable means, in violation of federal consumer protection and controlled-substances laws and Ohio law.

215.     McKinsey, Purdue, and other opioid manufacturers, engaged in a civil conspiracy to commit fraud and misrepresentation in conjunction with their unlawful marketing of opioids and/or distribution of opioids into Plaintiffs' and the Class's communities.

216.     McKinsey aided Purdue and other opioid manufacturers in unlawfully failing to act to prevent diversion and failing to monitor for, report, and prevent suspicious orders of opioids.

217.     McKinsey aided Purdue and other opioid manufacturers in unlawfully marketing opioids in Plaintiffs' and the Class's communities in furtherance of that conspiracy.

218.     McKinsey aided Purdue and other opioid manufacturers in unlawfully creating a public nuisance in Plaintiffs' and the Class's school districts.

219.     McKinsey's conspiracy and acts in furtherance thereof are alleged in detail in this Complaint, including, without limitation, in the public nuisance count and are specifically incorporated herein.

220.     McKinsey's overt acts in furtherance of this conspiracy include, but are not limited to, designing and implementing marketing messages that:

a.     Comprised untrue, false, unsubstantiated, and misleading marketing, directly and with and through third parties, in violation of 21 C.F.R. § 202.1(e), thereby causing opioid drugs to be misbranded;

b.     Promoted other purported advantages of OxyContin and other prescription opioids, including but not limited to improved function and quality of life in violation of FDA regulations, including 21 C.F.R. § 202.1(e);

c.     Promoted higher sales, higher dose sales, and targeted the highest volume prescribers of a highly abusable, addictive, and dangerous drug;

d.     Promoted higher dose OxyContin prescriptions, known to pose greater risks; and

   e. Targeted the highest prescribing physicians, without addressing whether those prescribers may be engaged in abuse and diversion and should not be targeted, to induce them to increase prescriptions of OxyContin further.

221. The conspiracy was the product of an agreement with McKinsey, Purdue, and other opioid manufacturers operating in close collaboration. When McKinsey's role in the conspiracy threatened to be exposed, upon information and belief, it took efforts to conceal its participation by attempting to destroy inculpating emails and files.

222. McKinsey, Purdue, and other opioid manufacturers acted with a common understanding or design to commit unlawful acts, as alleged herein, and acted purposely, without a reasonable or lawful excuse, which directly caused the injuries alleged herein.

223. McKinsey, Purdue, and other opioid manufacturers acted with malice, purposely, intentionally, unlawfully, and without a reasonable or lawful excuse.

224. McKinsey's conduct in furtherance of the conspiracy described herein was not mere parallel conduct. McKinsey encouraged Purdue, and other opioid manufacturers to act directly against their commercial interests in not reporting the unlawful practices of competitors to the authorities and in seeking to avoid "strict" regulation.

225. McKinsey's conspiracy as well as its actions and omissions in furtherance thereof caused the direct and foreseeable losses alleged herein.

226. McKinsey's actions demonstrated both malice and aggravated and egregious fraud. McKinsey engaged in the conduct alleged herein with a conscious disregard for the rights and safety of other persons, even though that conduct had a great probability of causing substantial harm. McKinsey's fraudulent wrongdoing was done with a particularly gross and conscious disregard.

227. McKinsey's misconduct alleged in this case was ongoing and persistent for many years.

228.    McKinsey's misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a school district would reasonably expect to occur and is not part of the normal and expected costs of a public school district's existence.

### F.    <u>Aiding and Abetting</u>

229.    Plaintiffs re-allege and incorporate by reference the foregoing allegations as if they were fully set out herein.

230.    The pleading of a separate claim for aiding and abetting in certain states does not waive any claim for vicarious liability under aiding and abetting principles under the laws of any state. Plaintiffs and the Class reserve the right to establish joint and several liability under aiding and abetting principles.

231.    McKinsey gave substantial assistance and/or encouragement to Purdue, Rhodes, the Sacklers, and other opioid manufacturers regarding conduct McKinsey knew to be tortious and/or in violation of a duty owed by Purdue, Rhodes, the Sacklers, and other opioid manufacturers to third persons, including Plaintiffs and the Class. McKinsey assisted and encouraged Purdue over many years to commit unlawful acts relating to the sales and marketing of Purdue's opioid products that McKinsey knew to be misleading and in violation of a reasonable standard of care. McKinsey gave substantial assistance and/or encouragement to Purdue to use unlawful means to commit lawful acts as part of these marketing efforts and sales.

232.    Further, McKinsey gave substantial assistance and/or encouragement to Purdue to take actions that violated state laws, including but not limited to public nuisance and statutory prohibitions through McKinsey's misleading and predatory marketing campaign.

233.    McKinsey and Purdue knowingly made or caused to be made false or misleading representations as to the characteristics, ingredients, uses, and benefits of opioids, generally, and Purdue's opioids, specifically, by downplaying the risks of addiction and abuse, overstating the efficacy, and misrepresenting the medical necessity of opioids, generally, and Purdue's opioids, specifically.

234.    McKinsey and other opioid manufacturers it assisted knowingly made or caused to be made false or misleading representations as to the characteristics, ingredients, uses, and benefits of opioids by downplaying the risks of addiction and abuse, by overstating the efficacy, and by misrepresenting the medical necessity of opioids.

235.    McKinsey acted with intent to facilitate the spread of misleading information by Purdue and other opioid manufacturers, specifically with regard to the misrepresentations about the addictiveness of opioids in its marketing and sales efforts.

236.    McKinsey, Purdue, Rhodes, the Sacklers, and other opioid manufacturers acted jointly in furtherance of the conspiracy.

237.    McKinsey, Purdue, and the Sacklers agreed to deploy unlawful sales and marketing tactics to achieve their shared objective of maximizing the revenue of a closely held company.

238.    McKinsey's support was a substantial factor in causing harm to third persons, including Plaintiffs and the Class.

### G.    Absolute Public Nuisance

239.    Plaintiffs re-allege and incorporate the allegations contained in the Common Law Nuisance cause of action.

240.    The public nuisance is an absolute public nuisance because McKinsey's nuisance-creating conduct was intentional and unreasonable and violated statutes that established specific legal requirements for the protection of others.

241.    McKinsey has created and maintained an absolute public nuisance through its participation in the deceptive marketing of opioids, which are dangerously addictive drugs, and efforts to boost opioid sales without regard to whether those sales were legitimate, in a manner which caused prescriptions and sales of opioids to skyrocket in Plaintiffs' communities, contributed to the oversupply of opioids in Plaintiffs' communities, and facilitated and

encouraged the flow and diversion of opioids into an illegal, secondary market, resulting in devastating consequences to Plaintiffs' school districts.

242.     McKinsey knew, and has known, that its intentional, unreasonable, and unlawful conduct would cause, and has caused, opioids to be used and possessed illegally and that its conduct has produced an ongoing nuisance that has had, and will continue to have, a detrimental effect upon the public health, welfare, safety, peace, comfort, and convenience of Plaintiffs' school districts

243.     McKinsey, in a joint effort with and on behalf of, Purdue and other opioid manufacturers, intentionally and unreasonably and/or unlawfully marketed and participated in Purdue and other opioid manufacturers pushing as many opioids onto the market as possible, fueling addiction to and diversion of these powerful narcotics, resulting in increased addiction and abuse, an elevated level of crime, death and injuries to the residents of Plaintiffs' communities, a higher level of fear, discomfort and inconvenience to the residents of Plaintiffs' communities, and direct costs to Plaintiffs.

244.     A violation of any rule or law controlling the sale and/or distribution of a drug of abuse in Plaintiffs' communities constitutes an absolute public nuisance. *See*, *e.g.* R.C. § 4729.35 ("The violation by a . . . person of any laws of Ohio or of the United States of America or of any rule of the board of pharmacy controlling the distribution of a drug of abuse . . . constitute[s] a public nuisance[.]").

245.     In the marketing and efforts to boost sales of opioids in Ohio and Plaintiffs' communities, McKinsey violated federal law, including, but not limited to 18 U.S.C. § 2 and 21 U.S.C. § 846 with respect to Purdue's violation of 21 U.S.C.A. § 823 and 21 C.F.R. § 1301.74, and Ohio law, including, but not limited to, R.C. § 2923.03 with respect to Purdue's violations of R.C. § 4729.01(F), R.C. §§ 4729.51-4729.53, and O.A.C. §§ 4729-912, 4729-9-16, and 4729-928.

246. McKinsey's unlawful nuisance-creating conduct includes aiding and abetting the violation of, and conspiracy with another to violate, federal and Ohio statutes and regulations, including the controlled substances laws, by:

      a.    Aiding, abetting, conspiring in, and expanding the distribution and sale of opioids in ways that facilitated and encouraged their flow into the illegal, secondary market;

      b.    Aiding, abetting, conspiring in, and expanding the distribution and sale of opioids without maintaining effective controls against the diversion of opioids; and

      c.    Aiding, abetting, conspiring in, and expanding distribution and sale of opioids prescribed by "pill mills" when McKinsey knew or should have known the opioids were being prescribed by "pill mills."

247. McKinsey's intentional and unreasonable nuisance-creating conduct, for which the gravity of the harm outweighs the utility of the conduct, includes:

      a.    Aiding, abetting, conspiring in, and expanding the distribution and sale of opioids in ways that facilitated and encouraged their flow into the illegal, secondary market;

      b.    Aiding, abetting, conspiring in, and expanding the distribution and sale of opioids without maintaining effective controls against the diversion of opioids; and

      c.    Aiding, abetting, conspiring in, and expanding distribution and sale of opioids prescribed by "pill mills" when McKinsey knew or should have known the opioids were being prescribed by "pill mills."

248. McKinsey intentionally and unreasonably aided, abetted, conspired in, and encouraged the distribution and sale of opioids that it knew would be diverted into the illegal, secondary market and would be obtained by persons with criminal purposes.

249. McKinsey intentionally and unreasonably engaged in, and helped to increase the impact of, a deceptive marketing scheme that was designed to, and successfully did, change the perception of opioids and cause their prescribing and sales to skyrocket in Plaintiffs' communities.

250.     McKinsey's conduct violated the Ohio Consumer Sales Practices Act, R.C. § 1345.01 *et seq.*, which prohibits unfair, deceptive, or unconscionable acts or practices in connection with a consumer transaction. Its conduct also violates O.A.C. § 09:4-3-10, which provides that it is a deceptive act or practice for a supplier (which includes a "person engaged in the business of effecting or soliciting consumer transactions" and need not be a person who "deals directly with the consumer," R.C. § 1345.01(C)), in connection with a consumer transaction to "[m]ake any representations, claims, or assertions of fact, whether orally or in writing, which would cause a reasonable consumer to believe such statements are true, unless, at the time such representations, claims or assertions are made, the supplier possesses or relies upon a reasonable basis in fact such as factual, objective, quantifiable, clinical or scientific data or other competent or reliable evidence which substantiates such representations, claims, or assertions of fact."

251.     McKinsey's unfair, deceptive, and unconscionable acts and practices include, but are not limited to:

a.     Engaging in untrue, false, unsubstantiated, and misleading marketing, directly, and with and through third parties, in violation of 21 C.F.R. § 202.1(e), thereby causing opioid drugs to be misbranded;

b.     Promoting other purported advantages of OxyContin, including but not limited to improved function and quality of life in violation of FDA regulations, including 21 C.F.R. § 202.1(e);

c.     Promoting higher sales, higher dose sales, and targeting the highest volume prescribers of a highly abusable, addictive, and dangerous drug;

d.     Promoting higher dose OxyContin prescriptions, known to pose greater risks; and

e.      Targeting the highest-prescribing physicians, without addressing whether those prescribers may be engaged in abuse and diversion and should not be targeted, to induce them to increase prescriptions of OxyContin further.

252.   McKinsey worked to undermine public policy, enshrined by regulations contained in state and federal law, aimed at ensuring honest marketing and safe and appropriate use of pharmaceutical drugs.

253.   In the connection with the marketing and sale of opioids in Ohio and Plaintiffs' communities, McKinsey violated and/or aided and abetted violations of R.C. § 2925.02(A), which states: "No person shall knowingly do any of the following:

(1) By force, threat, or deception, administer to another or induce or cause another to use a controlled substance; . . . or

(3) By any means, administer or furnish to another or induce or cause another to use a controlled substance, and thereby cause serious physical harm to the other person, or cause the other person to become drug dependent."

254.   McKinsey's marketing strategies were also instrumental in fueling addiction and diversion of drugs specifically known to McKinsey to be dangerous because, inter alia, these drugs are defined under federal and state law as substances posing a high potential for abuse and addiction.

255.   McKinsey's tortious conduct was a substantial factor in creating the absolute public nuisance.

256.   McKinsey acted with actual malice because McKinsey acted with a conscious disregard for the rights and safety of other persons, and said actions had a great probability of causing substantial harm.

257.   Plaintiffs assert this Cause of Action as a common law tort claim for absolute public nuisance and not as a "product liability claim" as defined in R.C. § 2307.71. In this Count,

Plaintiffs do not seek damages for death, physical injury to person, emotional distress, or physical damage to property, as defined under the Ohio Product Liability Act.

### H.    Injury through Criminal Acts (R.C. § 2307.60)

258.    Plaintiffs re-allege and incorporate the allegations contained in the Common Law Nuisance cause of action.

259.    R.C. § 2307.60(A)(1) provides that:

Anyone injured in person or property by a criminal act has, and may recover full damages in, a civil action unless specifically excepted by law, may recover the costs of maintaining the civil action and attorney's fees if authorized by any provision of the Rules of Civil Procedure or another section of the Revised Code or under the common law of this state, and may recover punitive or exemplary damages if authorized by section 2315.21 or another section of the Revised Code.

260.    In the marketing and efforts to increase the sale of opioids in Plaintiffs' communities, McKinsey violated R.C. § 2925.02(A), which states:

(1) By force, threat, or deception, administer to another or induce or cause another to use a controlled substance; . . . or

(3) By any means, administer or furnish to another or induce or cause another to use a controlled substance, and thereby cause serious physical harm to the other person, or cause the other person to become drug dependent."

261.    McKinsey's actions in deceptively marketing opioids and to expand opioid profits in the face of potential diversion, as described throughout this Complaint, knowingly induced or caused members of Plaintiffs' communities to use a controlled substance by deception, in violation of R.C. § 2925.02(A).

262.    Through McKinsey's actions as described in this Complaint, including deceptive marketing and aiding, abetting, conspiring in, and encouraging the deliberate disregard of obligations to maintain effective controls against diversion, McKinsey participated in furnishing controlled substances to residents of Plaintiffs' communities, or induced or caused residents of

Plaintiffs' communities to use a controlled substance, thereby causing serious physical harm to those persons and causing them to become drug dependent, in violation of R.C. § 2925.02(A)(3).

263. The exemption in R.C. § 2925.02 only applies to drug manufacturers and other persons when their "conduct is in accordance with Chapters R.C. § 3719., 4715., 4723., 4729., 4730., 4731., and 4741." R.C. § 2925.02(B). McKinsey and its clients were not in compliance with said Chapters and had thereby forfeited the protection provided by the exception.

264. In connection with the sale of opioids in Ohio and Plaintiffs' communities, McKinsey aided, abetted, conspired in, and encouraged the violation of R.C. § 2925.02(A)(2), which makes it a crime to: "Prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance or a controlled substance analog, when the offender knows or has reasonable cause to believe that the controlled substance or a controlled substance analog is intended for sale or resale by the offender or another person."

265. McKinsey may claim an exemption to R.C. § 2925.03(A)(2) only if its "conduct is in accordance with Chapters 3719., 4715., 4723., 4729., 4730., 4731., and 4741. of the Revised Code." McKinsey was not in compliance with said Chapters and had thereby forfeited the protection provided by the exception.

266. McKinsey engaged in additional criminal acts detailed in Plaintiffs' Absolute Public Nuisance claim.

267. It was foreseeable to McKinsey that its misconduct alleged in this Count would lead to addiction, abuse, misuse, and diversion of opioids, both in Plaintiffs' communities and throughout the United States.

268. Plaintiffs were within the zone of interest protected by these criminal laws.

269. As a direct and proximate result of McKinsey's criminal acts as described in this Count, Plaintiffs suffered injury and damages, for which Plaintiffs are entitled to recover pursuant to R.C. § 2307.60(A)(1).

270.    McKinsey's misconduct alleged in this case was ongoing and persistent for many years.

271.    McKinsey's misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur, and is not part of the normal and expected costs of a local government's existence. Plaintiffs allege wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

272.    Plaintiffs have incurred expenditures for special programs over and above their ordinary public services.

273.    McKinsey acted with actual malice because it acted with a conscious disregard for the rights and safety of other persons, and said actions had a great probability of causing substantial harm.

**I.    Engaging in a Pattern of Corrupt Activity (R.C. 2923.21 *et seq.*)**

274.    Plaintiffs re-allege and incorporate the allegations contained in the RICO cause of action.

275.    McKinsey and the opioid manufacturers with which it conspired are "persons" within the meaning of R.C. 2923.31(G) who conducted the affairs of an enterprise—the "Opioid Marketing Enterprise"— through a pattern of corrupt activity in violation of R.C. 2923.31.

276.    Plaintiffs are "person[s]," as that term is defined in R.C. 2923.31, who were injured as a result of McKinsey's wrongful conduct.

277.    Under R.C. 2923.32:

(A)(1) No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt.

(2) No person, through a pattern of corrupt activity or the collection of an unlawful debt, shall acquire or maintain, directly or indirectly, any interest in, or control of, any enterprise or real property.

(3) No person, who knowingly has received any proceeds derived, directly or indirectly, from a pattern of corrupt activity or the collection of any unlawful debt, shall use or invest, directly or indirectly, any part of those proceeds, or any proceeds derived from the use or investment of any of those proceeds, in the acquisition of any title to, or any right, interest, or equity in, real property or in the establishment or operation of any enterprise.

## Description of the Enterprise

278.  McKinsey, Purdue, and other opioid manufacturers were members of a legal entity enterprise within the meaning of R.C. 2923.31(C). McKinsey and these opioid makers formed an association-in-fact enterprise –the "Opioid Marketing Enterprise." The Opioid Marketing Enterprise consists of McKinsey, including its employees and agents, and the opioid manufacturers, including Purdue, described above.

279.  Alternatively, McKinsey and each of its co-conspirators constitutes a single legal entity or associated-in-fact "enterprise" within the meaning of R.C. 2923.31(C), through which the members of the enterprise conducted a pattern of corrupt activity. The Opioid Marketing Enterprise was, for years, an ongoing and continuing business organization that created and maintained systematic links for a common purpose: to ensure the prescription of opioids for chronic pain and to boost opioid sales through deceptive marketing and turning a blind eye to signs of potential diversion.

280.  McKinsey and the participating opioid manufacturers formed the Opioid Marketing Enterprise for the purpose of unlawfully increasing demand for, and thus sales of and revenues and profits from prescription opioids by maintaining an oversupply of prescription opioids through illegal practices, including committing fraud and drug offenses (as laid out above and below). McKinsey and these manufacturers, through the Opioid Marketing Enterprise, concealed the true risks and dangers of opioids from the medical community and the public, including the Plaintiffs, and made misleading statements and misrepresentations about opioids that downplayed the risk of addiction and exaggerated the benefits of opioid use — and sought to

profit from, and increase opioid prescribing even in the face of signs of potential diversion. At all relevant times, the Opioid Marketing Enterprise: (a) had an existence separate and distinct from McKinsey; (b) was separate and distinct from the pattern of corrupt activity in which McKinsey engaged; (c) was an ongoing and continuing organization consisting of individuals, persons, and legal entities, including McKinsey; (d) was characterized by interpersonal relationships between and among each member of the Opioid Marketing Enterprise, including McKinsey; (e) had sufficient longevity for the enterprise to pursue its purpose and functioned as a continuing unit.

281.    Upon information and belief, McKinsey and the other members of the Opioid Marketing Enterprise had a systematic link to each other through contractual relationships, financial ties, and continuing coordination of activities, as spearheaded by the opioid manufacturers and McKinsey. They coordinated for example, through McKinsey's urging to spread messaging through pain patients seemingly more credible than Purdue and encouragement for Purdue to band together with other manufacturers, described above. Their coordination can also be inferred through the consistent misrepresentations described in this Complaint.

282.    McKinsey and Purdue also created an organizational structure for the "E2E" program.

283.    Through their personal relationships, the members of the Opioid Marketing Enterprise had the opportunity to form and take actions in furtherance of the Opioid Marketing Enterprise's common purpose.

284.    Upon information and belief, McKinsey and Purdue exerted substantial control over the Opioid Marketing Enterprise through communications with each other.

285.    There was, upon information and belief, regular communication between McKinsey, Purdue, and other opioid manufactures, in which information was shared, misrepresentations and/or strategies are coordinated, and payments were exchanged. Typically,

the coordination, communication and payment occurred, and continues to occur, through the repeated and continuing use of the wires and mail, including, but not limited to, e-mail correspondence and use of the mails. McKinsey and the opioid manufacturer members functioned as a continuing unit for the purpose of implementing the Opioid Marketing Enterprise's scheme and common purpose, and each agreed and took actions to hide the scheme and continue its existence.

286.    Taken together, the interaction and length of the relationships between and among McKinsey and Purdue as well as, upon information and belief, Janssen and Endo, reflects a deep level of interaction and cooperation between two groups in a tightly knit industry with a common interest in preserving and expanding a broader market for opioids.

**The Enterprise's Conduct**

287.    During the time period alleged in this Complaint, McKinsey exerted control over, conducted and/or participated in the Opioid Marketing Enterprise by developing and implementing plans for fraudulently marketing opioids for the treatment of chronic pain and profiting from, and even expanded opioid sales and use through prescribers who raised red flags of potential diversion. In devising and executing the illegal scheme, the members of the Opioid Marketing Enterprise devised and knowingly carried out a material scheme and/or artifice to defraud the Plaintiffs and the public to obtain money by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts regarding the risks, benefits, and superiority of opioids in general and their opioids in particular.

288.    In addition, as part of this scheme, McKinsey and Purdue misled the public regarding their role in the opioid epidemic and commitment to combatting opioid addiction and abuse.

**Pattern of Corrupt Activity**

289.    McKinsey conducted and participated in the conduct of the affairs of the Opioid Marketing Enterprise, through a pattern of corrupt activity as defined in R.C. 2923.31(E) & (I)(2).

290.    Corrupt activities as defined in R.C. 2923.31(I) include, among other things: engaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing, or intimidating another person to engage in any conduct defined as racketeering activity under the Organized Crime Control Act of 1970, 84 Stat. 941, 18 U.S.C. § 1961(1)(B), (1)(C), (1)(D), and (1)(E), as amended; and, any "violation of section . . . 2913.05."

291.    A "'pattern of corrupt activity' means two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event." R.C. 2923.31(E).

292.    Incidents of corrupt activity include, but are not limited to:

a.    Wire Fraud: The members of Opioid Marketing Enterprise violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, fraudulent materials by wire for the purpose of selling opioids for chronic pain.

b.    Telecommunications Fraud: The members of Opioid Marketing Enterprise violated R.C. 2913.05 by "knowingly disseminat[ing], transmit[ing], or caus[ing] to be disseminated or transmitted by means of a wire, radio, satellite, telecommunication, telecommunications device, or telecommunications service any writing, data, sign, signal, picture, sound, or image with purpose to execute or otherwise further the scheme to defraud."

c.    Violation of Controlled Substances Act. The members of the Opioid Marketing Enterprise violated 21 U.S.C. § 483(a)(4), which makes it unlawful "for any person to knowingly or intentionally furnish false or fraudulent information in, or omit any material

information form, any application, report, record or other document required to be made, kept or filed under this subchapter," and a violation of which is punishable by up to four years in jail, *see* 21 U.S.C. § 483(d)(1), making it a felony.

293. Defendants used, directed the use of, and/or caused to be used, thousands of interstate wire communications in furtherance of these Enterprise's fraudulent scheme and common course of conduct to preserve and expand the market for their opioids and increase their profits through misleading and deceptive marketing and turning a blind eye to potential diversion. This conduct in furtherance of the Opioids Marketing Enterprise involved numerous separate communications.

294. The multiple acts of corrupt activity which the members of the Opioid Marketing Enterprise committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of corrupt activity."

295. McKinsey's participation in the Opioid Marketing Enterprise was necessary for the successful activity in which it engaged. The scheme devised and implemented by members of the Opioid Marketing Enterprise amounted to a common and continuing course of conduct intended to increase the profits and sales from prescription opioids by encouraging the prescribing and use of opioids for long-term chronic pain and seeking to increase sales even to prescribers potentially engaged in diversion. The scheme was a continuing course of conduct that went on for years.

296. As detailed above, McKinsey aided Purdue in committing various fraudulent acts which constitute fraud and a scheme to defraud. These intentional omissions of material fact and affirmative representations made through McKinsey's strategies and projects were false when made and also encouraged breach of Purdue's duties to guard against diversion and to report and halt sales to suspicious prescribers. McKinsey, as described above, received lucrative fees for the perceived value it added to the deceptive marketing and sales effort. McKinsey has also been

described as in possession of a "huge amount of inside information" due to its connections and operation of an internal hedge fund, known as McKinsey Investment Office.

297.    The multiple acts of corrupt activity which the members of the Opioid Marketing Enterprise committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of corrupt activity, through which the members of the Opioid Marketing Enterprise defrauded and intended to defraud Ohio consumers, the State, and other intended victims."

**Damages**

298.    McKinsey's contribution to the Opioid Marketing Enterprise, and the advancement of opioids-friendly messaging and efforts to "turbocharge" sales even amidst a growing epidemic fueled the opioid crisis.

299.    McKinsey's violations of law and the pattern of corrupt activity directly or indirectly caused the Plaintiffs' injuries. The Enterprise's pattern of corrupt activity logically, substantially and foreseeably caused an opioid epidemic. Plaintiffs' injuries, as described below, were not unexpected, unforeseen or independent. Rather, as the Plaintiffs allege, McKinsey knew that the opioids were unsuited to treatment of long-term chronic, non-acute, and non-cancer pain, or for any other use not approved by the FDA and knew that opioids were highly addictive and subject to abuse, and also had troubling signs of potential diversion, including among the same prescribers from which it planned increased opioid sales. Nevertheless, McKinsey and the Enterprise engaged in a scheme of deception that utilized the wires as part of their fraud, in order to increase sales of opioid products and the consulting fees McKinsey obtained from its efforts.

300.    It was foreseeable and expected that a massive marketing campaign that misrepresented the risks and benefits of prescription opioids as well as methods to increase sales to prescribers that raised red flags of (and/or were found to have been engaged in) diversion, would lead to a nationwide opioid epidemic and a devastating public health crisis in Plaintiffs'

communities. Plaintiffs' injuries were logically, foreseeable, and substantially caused by the opioid epidemic that McKinsey, and the Enterprise, created.

301.    McKinsey's pattern of corrupt activity directly and proximately caused the Plaintiffs injuries because Plaintiffs paid for costs associated with the opioid epidemic, as described above in language expressly incorporated herein by reference. But for Defendants' conduct, the Plaintiffs would not have incurred the costs for health care and addiction treatment, law enforcement, child welfare, and other expenditures required as a result of the opioid epidemic.

## X.    PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of the Class they seek to represent, respectfully pray for the following relief:

1.    An order certifying the Class as defined above, appointing Plaintiffs as the representatives of the Class, and appointing their counsel as Class Counsel;

2.    An award of all economic, monetary, actual, consequential, compensatory, and punitive damages available under the law, including trebling of economic injury;

3.    An award of all equitable relief requested herein;

4.    Injunctive/equitable relief;

5.    An award of reasonable litigation expenses and attorneys' fees;

6.    An award of pre- and post-judgment interest, to the extent allowable; and

7.    Such other further relief that the Court deems reasonable and just.

## XI. <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury on all issues so triable.

Dated: December 14, 2021                    Respectfully submitted,

By: */s/ Marc Gertz*
Marc Gertz, #0003808
mpgertz@gertzrosen.com
Gertz & Rosen, Ltd.
11 S. Forge Street
Akron, OH 44304
Telephone: (330) 255-0727

Cyrus Mehri
Joshua Karsh
C. Ezra Bronstein
cmehri@findjustice.com
jkarsh@findjustice.com
ebronstein@findjustice.com
Mehri & Skalet, PLLC
2000 K Street NW, Suite 325
Washington, DC 20006
Telephone: (202) 822-5100

Neil Henrichsen
Allison Cross
nhenrichsen@hslawyers.com
across@hslawyes.com
Henrichsen Law Group, PLLC
655 15th Street, N.W. Suite 800
Washington, DC 20005
Telephone: (202) 423-3649

Wayne Hogan
Leslie A. Goller
hogan@terrellhogan.com
lgoller@terrellhogan.com
Terrel Hogan Yegelwel, P.A.
233 East Bay Street, 8th Floor
Jacksonville, FL 32202
Telephone: (904) 722-2228

Matthew J. Piers
Margaret Truesdale
mpiers@hsplegal.com
mtruesdale@hsplegal.com
Hughes Socol Piers Resnick & Dym, Ltd
70 W Madison St., Suite 4000
Chicago, IL 60602
Telephone: (312) 604-2606

*Plaintiffs' Attorneys*